**FLORIDA MINING & MATERIALS CORP. d/b/a McCormick Concrete Company, Petitioner-Cross Respondent.**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

No. 72–2810.

United States Court of Appeals, Fifth Circuit.

July 12, 1973.

Rehearing and Rehearing En Banc Denied Oct. 24, 1973.

Donald B. Harden, Charles Kelso, Atlanta, Ga., for petitioner.

Elliott Moore, Acting Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Harold A. Boire, Regional Director, Tampa, Fla., William L. Corbett, Washington D. C., for respondent.

Before TUTTLE, GODBOLD and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

The National Labor Relations Board seeks enforcement of its finding that Florida Mining & Materials Corporation violated section 8(a)(5) and (1) of the National Labor Relations Act by refusing to bargain with the certified representative of the employees at its Jacksonville, Florida, plant. Following an election in an appropriate unit, Local 512 of the Teamsters Union had been se-

lected as the bargaining representative. The company admits it refused to bargain, alleging that the refusal was necessary to obtain a court test of the propriety of the selection of Local 512. The challenge to certification was based on a single issue in connection with the representative election. If the Board resolved that issue properly, enforcement of this bargaining order must be granted.

This case turns on the resolution of a single extremely complex issue. The National Labor Relations Board has resolved the question in favor of the union, relying heavily on the burden to the administrative process which would allegedly follow from a contra result. We are faced with reviewing the Board's determination to determine its propriety.

## I

The union and the company agreed in August, 1971, that a Board supervised consent election would be held on September 23, 1971. On September 22, 1971, the day before the election, the local union received notice from the International Brotherhood that it had been placed under temporary trusteeship pending a full hearing on whether the trusteeship should continue. The existence of this trusteeship and the underlying reasons therefor were not made known to the public, the company, or the voting employees prior to the election. Of the forty-one ballots cast, twenty-one were for the union, fifteen against the union, and five challenged.

The company filed timely objections to the election, alleging that concealment of the trusteeship invalidated the election results and required a rerun election. On November 16, 1971, the Regional Director recommended that the Board overrule the company's objections and certify the union. The Board adopted the Regional Director's report. The company has refused to bargain since that certification, resulting in this current enforcement proceeding.

## II

To gauge the relevance of this imposed trusteeship on the needs and desires of the employees of the company it is necessary to understand the reasons for the trusteeship and the factual background leading to its imposition. The notice sent to the local union by International President Fitzsimmons clearly sets forth the reasons that this step was now being taken. Basically, this notice pointed out that there was an irreconcilable conflict between the top union officers which rendered the local unable to function. The notice further stated that the executive board members had chosen sides and failed to take any action to alleviate the situation. The principal cause of the conflict was alleged to be a racial dispute which was threatening to split the entire local into two distinct camps. The last paragraph of the notice stated:

> Unless immediate action is taken, it cannot be assured that the Local Union will be able to fulfill its duties as bargaining representative or to carry out the other legitimate objects of a labor organization.

International Vice President Joseph Morgan was appointed as trustee.

A few days after assuming the trusteeship Morgan gave an interview to the local newspaper which served as the basis for an article included in the record. This interview showed that the trustee had replaced all officers and business agents of the union. In addition to stating that the union was getting to the point where it could not function and alluding to recent incidents illustrating the racial conflict, Morgan pointed out that the local also had a debt of at least $18,000.00, which he attributed to financial mismanagement. After pointing out that he had had to make several trips to Jacksonville in trying to settle these internal problems, Morgan stated, with regard to the local: "It has a history of internal political double crossing and now I wonder whether or not it can ever really be straightened

out." He also expressed doubt about the continued existence of the local.

The same newspaper article contained a picture and description of picketing at the union headquarters by union members who were greatly disturbed by both the imposition of the trusteeship and the firing of officers and agents. It is obvious that the trusteeship and the underlying causes therefor had a significant and direct impact on the local union members.

### III

Thus, we are required to decide if the employees of Florida Mining were, on the facts of this case, in a position to exercise a full and free choice in the selection of their bargaining representative. Was the Board proper in holding this election free from taint because it found that the union under trusteeship could still carry on the functions of a labor organization? That is really the only question in this case.

The company tries to bring this case within the traditional realm of activity requiring rerun elections for the company suggests affirmative misrepresentations by the union. A union meeting was allegedly scheduled with the employees for the night before the election. This meeting was cancelled. The employer argues that the cancellation of this meeting was a deliberate attempt to keep the employees from learning about the trusteeship, because notice of the existence of the trusteeship would have had to be posted as required for all to see. The company contends that this deliberate attempt to conceal the trusteeship amounts to a misrepresentation.

As the Board points out, there is not sufficient evidence in the record to show that any scheduled meeting was cancelled. The only evidence consisted of form affidavits signed by three employees to the effect that the employees had heard there was going to be a meeting about the election on that night but that it had been cancelled. We agree that there is insufficient evidence to show an affirmative misrepresentation in this case.

The Board seeks to frame the issue posed by this case more precisely. It is their contention that the company is seeking to have the Board adopt a totally new standard which it has never considered in the past. The Board maintains that the only way to cast a suitable rule for this situation would be to inject an "affirmative disclosure" requirement. As the Board points out, such a rule has never been formulated or imposed in any reported case.

The Board argues strongly against such a rule. Its primary reliance is bottomed on the assertion that such a rule would create an unbearable administrative burden in return for only marginal benefit. The Board points out the great difficulty in determining the scope and extent of an affirmative disclosure rule. They suggest that losing parties would be quick to take advantage of any such rule in an effort to avoid the consequences of a free election. In short, they seek to avoid endless litigation on a case by case basis as to what may or may not have been material and what may or may not have been subject to disclosure.

The Board suggests that it is not in a position to supervise and control full and complete disclosure of all facts which might affect a voting employee. Rather it sees its role as simply to ensure fair play and to act only where a party has affirmatively misrepresented a material fact under circumstances where it is important for the other party to make a meaningful response. Under the campaign processes as they now exist, the competing arguments pro and con on unionization are left to be presented by the parties. The employer, because of supposed financial and entrepreneurial disadvantages flowing from unionization, is assigned the role of bringing the alleged negative aspects of unionization to the attention of the electorate. Likewise, the union is to stress its advantages. The Board, as referee, steps in only in the case of low blows, and even

then only when the injured party does not have sufficient time to present a response.

Furthermore, the Board feels that any rule for affirmative disclosure would not return any real benefit. It argues that no one knows what diverse information the electorate might find useful in assessing the pros and cons of unionism. The Board actually admits that in all likelihood the voter's choice is "too often inescapably non-rational," relying on a noted law review article. Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 65. Thus, the Board seems to be saying that specific information is rarely, if ever, important to an employee faced with a unionization vote.

Finally, the Board maintains that even if some sort of alternative disclosure should be required, this is not the appropriate case therefor. According to the Board, the consequences of a trusteeship are not of a type which will likely affect the voter's choice. The Board feels that the only relevant factor to the voting employee is the hope of direct benefits flowing to the individual from the ability to deal collectively and thus more equally with management. As long as a union in trusteeship can function as a bargaining agent, the employees have all they want. The Board goes so far as to argue that studies of employee non-participation amply illustrate that democratic participation in union affairs is not an important concern of voters. We do note, however, that the Board admits the revelation of the trusteeship would have brought to light all of the problems present in the administration of this local.

IV

■■ At the outset, we must point out that the NLRB is given broad discretion in representation matters. NLRB v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946); NLRB v. Waterman S. S. Co., 309 U.S. 206, 226, 60 S.Ct. 493, 84 L.Ed. 704 (1940); NLRB v. Golden Age Beverage Co., 5 Cir. 1969, 415 F.2d 26, 29. The party challenging the results of a representation election has the "heavy" burden (Shoreline Enterprises of America, Inc. v. NLRB, 5 Cir. 1959, 262 F.2d 933) of showing adequate reasons to set aside the election. Bush Hog, Inc. v. NLRB, 5 Cir. 1969, 420 F.2d 1266. We also agree that "the results of a secret ballot, conducted under government sponsorship and with all the safeguards which have been developed throughout the years, should not be lightly set aside." Liberal Market, Inc., 108 NLRB 1481 (1954); accord, NLRB v. Zelrich Co., 5 Cir. 1965, 344 F.2d 1011.

■ The Board has decided that the employer has failed to show any affirmative misrepresentation by the union on the facts in this election. We are forced to agree with the Board that there was not sufficient evidence to show any such affirmative misrepresentation. Even if cancellation of a scheduled meeting could be a material misrepresentation under the circumstances of this case, a characterization which we seriously doubt, there is not sufficient evidence to show that such a meeting was scheduled and cancelled. As far as the claim that the union made affirmative misrepresentations about its ability to represent the employees while it was suffering from internal discord, we again must agree with the Board and Regional Director who found that a union in trusteeship, despite some interruption of normal operations, could still function as a viable union organization. Thus, we accept the Board's finding that this union was able to represent these employees while in trusteeship and that any statements prior to the imposition of the trusteeship which indicated that the union could adequately represent these employees could not be considered material misrepresentations.

We come down to basically evaluating the probable impact of the imposition of the trusteeship and the underlying problems in the local which would be publicly disclosed on the choices to be made by

the voting employees. In short, our only question is has the Board abused its discretion by holding that imposition of a trusteeship on the eve of an election is not such a significant event that the election must be set aside and a rerun election held? While this is a very close and complex issue involving significant policy judgments, we cannot say that the Board has abused its discretion in refusing to overturn the election and, therefore, we must enforce the bargaining order. We note at this point that this may well be a unique problem which arises only because of the close timing between the imposition of the trusteeship and the election.

Had the trusteeship been imposed a day or two sooner its existence would have almost certainly been publicly known prior to the election. The employees would have known of the trusteeship although they might not have had an opportunity to have it explained so that they would be able to put it in proper perspective vis-a-vis their reasons for voting for a union.[1]

Had the notice of trusteeship been received on the day following the union's victory at the polls, it would be highly unlikely that a rerun election would be proper. Furthermore, there would be no rerun available for employees one month, six months, and so forth, after election if their local were to be put in trusteeship. There would, of course, be the opportunity for decertification petitions once the certification year had elapsed. But for a significant period, these union members have to live with the trusteeship.

The employer argues that only with the trusteeship could the employees learn of the internal problems within this union. At least as far as this local goes, we find that difficult to accept. First, under the Board's view of elections and election campaigns, the employer is charged with the responsibility of bringing factors adverse to unionization to the attention of the voters. Thus, in the normal case employers will have exploited all known weaknesses in a local union's internal affairs. This local had been constantly beset by strife. Only a few years earlier it had been placed in trusteeship by the International for internal problems. There seems no doubt here that the company should have or should have had ample evidence of internal problems in this union to bring to the voters' attention. Thus, the imposition of the trusteeship under these circumstances was somewhat anti-climactic.

The Board fears implementation of an affirmative disclosure rule would create a difficult administrative burden and be of doubtful value. We agree that there would be great difficulty in assessing what types of information should or should not have to be disclosed by either union or management during an election campaign. Furthermore, such a rule would give losing parties even more reason and a new method to fight an adverse outcome at the polls. This would also add even more to the great delay which often accompanies election of a bargaining representative because of drawn out court battles over oft-times frivolous claims.

While the imposition of a trusteeship has serious consequences which have resulted in strict controls being imposed by Congress, in many important ways the local membership is not affected. The former heads of a local are generally replaced but the membership still retains its vote on contract terms and strikes. The trusteeship is designed to be temporary in nature, ceasing when the local's affairs have been sufficiently straightened out to allow it to return to a great degree of self-government.

1. It might be interesting to speculate about the Board's reaction had the word of the trusteeship gotten out on election eve without the opportunity for an explanation of its scope by the union. In such a case, the Board might be tempted to order a rerun election to give the union time to explain. Such a position, however, would seem to conflict with this case.

The Board also seems to have relied on a feeling that election procedures and evaluation of various campaign propaganda statements illustrate that the choice of a local would be basically irrational. Furthermore, the Board maintains that generally the employees are only interested in obtaining better benefits and conditions from collective action while at the same time weighing possible harm from long strikes or loss of good relations with management. Therefore, the Board argues that the imposition of a trusteeship which still allows these basic roles to be maintained has relatively little impact on employee voting. To support this thesis the Board points to articles which have dealt with the difficulties of unions in getting members to attend meetings and take an active part in union affairs.

Thus, the Board has determined that imposition of a last-minute trusteeship prior to an election is such an insignificant occurrence that it will not justify a rerun election where the union prevails. Since this situation falls outside the Board's normal rule involving affirmative misrepresentations with no time to reply, the Board, after weighing the many complex competing interests, has decided that a new rule requiring a rerun election under these circumstances is of doubtful value and would create undue hardship.

As noted, this is indeed an extremely close question. It appears to the court that employees should have the right to know prior to voting for a union that at least for a short time actual control of the day to day administration of the local was to be handled by a representative of the International, not by those people whom the employees had understood to be the heads of the local. On the other hand, we fully recognize the administrative difficulties which would follow from a rule designed to cover this case. Furthermore, we agree that recalcitrant employers would take advantage of the situation and file meaningless challenges in an effort to further delay implementation of the desires of the employees. Since ours is not a duty to resolve these intricate competing interests but only to review the initial decision of the administrative body, we do not feel we have to analyze and balance these competing factors in detail. The Board is given broad discretion in representation matters and in ordering rerun elections. We are convinced that the Board has given close consideration to the competing positions in this case and has exercised its broad discretion in making a policy decision based on a choice between fairly equal but competing considerations.

Since we find that the Board did not abuse its discretion in failing to require a rerun election, we must find that the refusal to bargain with the union was a violation of the National Labor Relations Act and the Board's order is

Enforced.