J. RAY McDERMOTT & CO., INC.,
Petitioner-Cross Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent-Cross
Petitioner.

No. 77–1171.

United States Court of Appeals,
Fifth Circuit.

April 18, 1978.

C. Dale Stout, Howard S. Linzy, Andrew C. Partee, Jr., New Orleans, La., for petitioner-cross respondent.

Elliott Moore, Deputy Associate Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Michael S. Winer, Woody N. Peterson, Attys., N. L. R. B., Washington, D. C., for respondent-cross petitioner.

Before HILL, RUBIN and VANCE, Circuit Judges.

RUBIN, Circuit Judge:

McDermott[1] petitions to set aside a decision of the NLRB holding that it has unlawfully refused, in violation of the National Labor Relations Act, §§ 8(a)(1) and 8(a)(5), to bargain with Local 1012,[2] the certified bargaining agent of certain of its employees, and ordering McDermott to bargain with that union.

McDermott contends that the order is invalid because (1) the Board's decision to certify the International Association of Professional Divers ("IAPD") as bargaining agent for all regular divers, tenders and rack operators in McDermott's Diving Division was invalid; (2) the Board's decision to amend IAPD's certification to name Local 1012 as bargaining agent was invalid; (3) Local 1012's unfair labor charge was time-barred under the National Labor Relations Act, § 10(b); and (4) McDermott entertained good faith doubt, at the time it refused to bargain, that the Local represented a majority of McDermott's employees. Because McDermott's arguments are not well-founded, we order that the Board's decision, in all respects, be enforced.

I.

On May 25, 1970, the International Association of Professional Divers, Inc. of Louisiana ("IAPD, Inc."), was incorporated as a not-for-profit corporation to further the interests of professional divers, primarily

---

1.  J. Ray McDermott, Inc.

2.  Professional Divers Local 1012, United Brotherhood of Carpenters and Joiners of America, AFL–CIO.

those operating off the Gulf Coast. An unincorporated association named the International Association of Professional Divers ("IAPD"), which had the same officers and the same members as the corporation, began to function as a labor organization for the purpose of organizing Gulf Coast divers and securing collective bargaining contracts that would further their interests.[3]

### Certification of the IAPD

On February 11, 1974, the IAPD entered into an agreement to affiliate with the Marine Engineers Beneficial Association ("MEBA"), a national union. The affiliation was later completed, and a formal charter was issued by District 2, MEBA.

In the spring of 1974, IAPD–MEBA petitioned for a representation election among McDermott employees. The local Regional Director of the NLRB ordered an election to be held in the early summer among all regular divers, tenders, and rack operators in McDermott's Diving Division. IAPD–MEBA won the election, but, upon the employer's objections, the NLRB set it aside. *J. Ray McDermott & Co., Inc.*, 1974, 215 NLRB 570.

In December, 1974, the Regional Director ordered a second election, which, like the first, was to be conducted by mail ballot. Balloting kits were subsequently sent to 86 eligible employees. As of the February 26, 1975 voting deadline, 39 votes were cast for IAPD–MEBA; 36 votes were cast against IAPD–MEBA; 6 ballots were cast and challenged by the employer; 1 eligible employee had died; 1 employee lost his ballot return envelope and was unable to secure a replacement and to vote by the deadline; and 3 employees' ballots were not received. These three each testified later that each had separately mailed a timely ballot. These three ballots could have affected the outcome of the election.

Primarily on the basis that these three ballots had not been received, the employer objected to certification of IAPD–MEBA. The Regional Director, however, overruled McDermott's objections and, on April 18, 1975, certified IAPD–MEBA as exclusive bargaining agent for all regular divers, tenders and rack operators in McDermott's Diving Division. The NLRB affirmed his decision on June 30, 1975.

On July 3, 1975, Paul Woodhall, President of IAPD–MEBA, wrote to the Manager of McDermott's Diving Division on an IAPD, Inc. letterhead asking to start collective bargaining and requesting information pertaining to the anticipated negotiations. On July 10, 1975, the Division Manager informed Woodhall that McDermott would not furnish the requested information or bargain with IAPD–MEBA because McDermott disputed the validity of the union's certification. Woodhall reiterated the union's request by letter on July 21, 1975; the request was again denied on July 24, 1975.

### Creation of Local 1012

On July 7, 1975, President Woodhall mailed notice to all IAPD members, including members working for employers other than McDermott, informing them that at the regular quarterly meeting to be held on July 11, 1975, the membership would consider a resolution to disaffiliate from District 2, MEBA, and the possibility of affiliation with "another international union." A separate notice was sent to the members in their capacity as shareholders of IAPD, Inc., informing them of a shareholders' meeting to be held at a later time on July 11, 1975, to consider dissolution of the corporation.

The meeting of IAPD–MEBA was held as scheduled. Only members of the union were admitted. Resolutions were offered to disaffiliate from MEBA and to transfer affiliation to the United Brotherhood of Carpenters and Joiners of America, AFL–CIO ("United Brotherhood"), to become Local 1012 of that union. Following discussion of the resolutions, a vote was taken by secret ballot. The results were 77 to 1 in favor of disaffiliation from MEBA, and 76 to 2 in favor of affiliation with the United Brotherhood. The meeting was adjourned,

---

**3.** The IAPD's organizational structure is considered at Part III, B, *infra*.

and the members reconvened as IAPD, Inc. shareholders, voting unanimously by show of hands to dissolve the corporation. Upon the adjournment of the corporate meeting, President Woodhall introduced a vice-president of the United Brotherhood, who presented the members with a charter for Local 1012.

As of July 11, 1975, IAPD–MEBA had roughly 200 members. The union's records do not indicate how many of the 76 voting to affiliate with United Brotherhood worked on July 11, 1975 for McDermott and how many worked for other bargaining units. The leadership of Local 1012, therefore, took steps in late July, 1975 to secure ratification of the affiliation transfer by a majority of employees in the McDermott Diving Division, both union and non-union, prior to seeking an amendment of IAPD's certification as bargaining agent of that unit. President Woodhall requested a list of all current employees from McDermott's Division Manager. The Manager denied Woodhall's request for such a list. The union then mailed balloting kits to 95 McDermott employees, whose names were gathered from the list of employees available from the most recent prior election at McDermott and from information supplied by some of McDermott's employees. McDermott at this time had a total of 101 employees. In September, a third party hired to count the ballots certified that 54 of the 60 voters who returned ballots approved the transfer of affiliation.

On September 2, 1975, Local 1012 filed a petition with the NLRB to amend the certification of IAPD–MEBA to recognize the union's change in identity to Local 1012. After a hearing, the certification was amended as requested on April 12, 1976.

Three days later, Local 1012 formally requested that McDermott engage with it in collective bargaining. The company formally refused, and the union filed an unfair labor charge alleging a refusal to bargain. In January, 1977, the Board rendered the decision that it now seeks to enforce, finding that McDermott had unlawfully refused to bargain and ordering it to bargain with Local 1012.

## II.

The first ground on which McDermott defends its refusal to bargain with Local 1012 is the asserted invalidity of the original certification of Local 1012's predecessor, the IAPD, as exclusive bargaining agent for the regular employees of McDermott's Diving Division. McDermott insists that, if a number of timely cast ballots sufficient to affect the outcome of an election are lost without any fault on the part of the employees casting their ballots, the NLRB cannot lawfully rely on such an election as establishing that a union enjoys majority support among the employees in the designated bargaining unit on the basis of its receiving a majority of the votes actually counted.

In reviewing the Board's actions, we must begin with the premise that Congress has entrusted the Board with wide discretion in the administration of representation elections, *NLRB v. A. J. Tower Co.*, 1946, 329 U.S. 324, 330–331, 67 S.Ct. 324, 328, 91 L.Ed. 322. The party challenging the results of a representation election shoulders a heavy burden of showing adequate reasons for setting aside the results, *Florida Mining & Materials Corp. v. NLRB*, 5 Cir. 1973, 481 F.2d 65, 68, *cert. denied*, 1974, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886. Judicial review of the Board's determination of a representation dispute within its jurisdiction "is limited to ascertaining whether the Board's determination is within reasonable bounds," *Bush Hog, Inc. v. NLRB*, 5 Cir. 1969, 420 F.2d 1266, 1268, *quoting, NLRB v. Laney & Duke Storage Warehouse Co.*, 5 Cir. 1966, 369 F.2d 859, 864. *See also, NLRB v. W. S. Hatch Co., Inc.*, 9 Cir. 1973, 474 F.2d 558, 561; *NLRB v. Olson Bodies, Inc.*, 2 Cir. 1970, 420 F.2d 1187, 1189, *cert. denied*, 1971, 401 U.S. 954, 91 S.Ct. 966, 28 L.Ed.2d 237.

The Regional Director here found that the election was fairly conducted and that insufficient doubt was cast on the validity of the result to overcome the Board's

and the parties' interest in the finality of the representation proceedings. In reaching his determination, the Regional Director relied on *Versail Manufacturing, Inc.,* 1974, 212 NLRB 592, in which the Board certified the results of a representation election as final notwithstanding one employee's inability to reach the polling place in time to vote. The Regional Director determined that, even though three uncounted ballots were timely cast and could have affected the outcome of the election, neither the Board, the union, nor the employer was responsible for the loss of the ballots.

The Regional Director properly weighed the competing interests before him. First, he properly concluded that the initial decision to hold the second representation election by mail was proper. The prior mail ballot had secured a high degree of participation. Because the employees involved worked a variety of shifts in scattered locations, a mail ballot was the only practical way to secure votes in a reasonable amount of time, and could best be expected to insure fairness and the broadest participation possible in the vote.

Further, the parties' interest in the finality of the representation proceedings was a substantial one. The difficulties in conducting a definitive poll among McDermott employees had already postponed collective bargaining for over a year after the union first petitioned for an election. It is reasonable for the Regional Director to have found that the election results, given all the relevant circumstances, adequately demonstrated that the majority of unit employees desired representation by the IAPD. He properly found that the election was conducted fairly, and that the non-receipt of the mail ballots was an "unplanned occurrence beyond the control of the parties, the Board, or the [voting employees]," *Versail Manufacturing, supra,* 212 NLRB at 593.

It cannot be said that an election by mail is *per se* invalid whenever a potentially decisive number of votes, no matter how small, is lost through the vagaries of mail delivery. Such a rule might unduly deter the use of mail balloting in cases like this in which a mail election, though less readily supervisable than a ballot box election, might prove more representative of, and fairer to, the voting employees.

We do not decide here that the decisions of the Regional Director and of the Board in this case were necessarily the wisest possible, or that, in future representation cases, the interests of the parties in finality shall always be deemed to overcome even occurrences beyond the parties' or the Board's control that prevent potentially decisive numbers of votes from being counted. We decide only that the balance struck by the Board in this case was reasonable. We are bound to regard the certification of the IAPD as valid.

### III.

McDermott further asserts that the Board's decision in 1976 to amend the IAPD's certification to name Local 1012 as the McDermott employees' bargaining agent was invalid: first, because the Board erred in its conclusion that the transfer of affiliation was approved through proper democratic means; second, because the Board erred in concluding that Local 1012 was merely the continuation of IAPD under another name, rather than a new organization taking over the IAPD's certification without an election.

### A.

McDermott's grounds are essentially those set forth in NLRB member Walther's dissent from the certification amendment decision, *Ocean Systems, Inc.,* 1976, 223 NLRB 857. It argues that (1) the notice to members of the impending vote was insufficiently specific, (2) members were not given sufficient notice for adequate debate and consideration prior to the meeting, (3) MEBA representatives were excluded from the meeting, (4) the meeting was conducted by officers already known to favor a transfer of affiliation, (5) members were presented with no alternative to the officers' resolutions, (6) insufficient time was provided at the meeting for discussion and debate,

and (7) the voters approving transfer did not constitute a majority of the union.

■ We agree with the Board majority that the objections McDermott raises are either unsupported, irrelevant, or outweighed by other evidence of fairness in the election process.[4] What constitutes adequate notice or time for consideration of a particular issue can be judged only when all of the circumstances are considered. In the present case, the members received mailed notice that was not misleading and that complied with the by-laws and constitution of the corporation and of the unincorporated association. Over one-third of the union attended the quarterly meeting. Of the 78 members voting, all but one approved disaffiliation from the MEBA, and all but two approved the transfer of affiliation. The record offers evidence of some discussion among the members; the absence of longer debate is as consistent with the conclusion of overwhelming membership agreement as with McDermott's offered conclusion that the result was railroaded through. The members' right to a secret ballot was adequately protected, and the majority of members voting, as well as the majority of employees in the bargaining unit, have offered no complaints or opposition to the transfer of affiliation. *Amoco Production Co.,* 1975, 220 NLRB 861.

■ The record clearly evidences the union leaders' support for an affiliation transfer, but that fact alone hardly invalidates the results of the meeting they chaired. *Hamilton Tool Co.,* 1971, 190 NLRB 571. The task of union leaders is to lead; they cannot be faulted for sponsorship of a particular program so long as their leadership is fair and protective of the union members' rights. The members here were presented with an obvious alternative to approval of the officers' resolutions, namely, disapproval. The election result is not suspect because non-members and MEBA representatives were excluded from the deliberations.[5]

■ The record in this case demonstrates overall fairness and substantial compliance with the union's own by-laws and constitution in contrast with those cases cited by McDermott in support of its position.[6] Con-

---

4. The Board's standard for review of affiliation transfer elections is set forth in *Hamilton Tool Co.,* 1971, 190 NLRB 571, 575.

   While the election procedures . . . may not measure up to standards the Board demands for its own elections, . . . [they were not] so lax or so 'substantially irregular' as to negate the validity of the election. . .

5. McDermott also objects because only about two-fifths of the IAPD's membership voted on the transfer resolutions. So long as the absence of a majority of union members at an election cannot be attributed to unfair action by any party, it must be presumed that those who could have voted, but did not, assented to the will of the majority of those voting. *Cf., NLRB v. Singleton Packing Corp.,* 5 Cir. 1969, 418 F.2d 275, 279, *cert. denied,* 1970, 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53; *NLRB v. Whittier Mills Co.,* 5 Cir. 1940, 111 F.2d 474, 477; *North Electric Co.,* 1967, 165 NLRB 942.

6. In *American Bridge Division, United States Steel Corp. v. NLRB,* 3 Cir. 1972, 457 F.2d 660, the court denied enforcement of a Board order granting an affiliation transfer, in part because the members were given insufficient time for debate and consideration of the transfer proposal. However, unlike the officers in the present case, the union leaders in *American Bridge Division* were presented in advance of the vote with a demand by a substantial group of dissenting members for a special meeting to consider reaffiliation without a vote being taken. The officers' refusal to hold such a meeting was manifestly unresponsive to the legitimate request of some members for extended debate. Here, the record reveals no such body of complaining dissenters, substantial or otherwise, before, during, or after, the transfer of affiliation. Thus, the union leadership cannot be charged with suppressing debate that the members desired.

In *NLRB v. Bear Archery,* 6 Cir. May 10, 1977, 95 LRRM 3094, the Sixth Circuit denied enforcement to a Board order granting a certification amendment, *Bear Archery,* 1976, 223 NLRB 1169, basing its denial on a dissent by Board member Walther substantially similar in principle to his dissent in this case. We note, however, without expressing our approval or disapproval of the Sixth Circuit's decision, that *Bear Archery* is distinguishable on its facts. In *Bear Archery,* some doubt was cast on the secrecy of the balloting process. Further, no discussion by the voting membership as a whole was held prior to the balloting. Voting members entered a room in which they could either proceed to vote in one corner, or, in

sidering the record as a whole, we do not find that the Board was unreasonable in concluding that the IAPD's members had sufficient time and opportunity to consider the proposed transfer of affiliation. We approve the Board's finding that no irregularity so infected the election process as to invalidate the election result.

### B.

Whether or not a merged union should continue to be considered the bargaining representative of a unit of employees depends on a factual determination—is it a continuation of the old union under a new name or is it a substantially different organization?

*NLRB v. Commercial Letter, Inc.,* 8 Cir. 1974, 496 F.2d 35, 39.

■ This factual determination is for the Board to make initially. We are commanded in principle and by precedent not to re-examine its decision if it is supported by substantial evidence on the record as a whole. *NLRB v. Commercial Letter, Inc., supra; see also, Carpinteria Lemon Assn. v. NLRB,* 9 Cir. 1956, 240 F.2d 554, 557, *cert. denied,* 1957, 354 U.S. 909, 77 S.Ct. 1295, 1 L.Ed. 1427.

McDermott objects to the certification amendment on the ground that Local 1012 is not merely the IAPD with another name, but an altogether new and different bargaining agent. Virtually all of the differences McDermott cites, however, are differences not between the IAPD and Local 1012, but between the MEBA and the United Brotherhood. The record fails to show any substantial difference between the IAPD and its successor that would support the conclusion that Local 1012 is a genuinely different organization.

■ The factual determination at issue revolves not around superficial criteria such as the size of the respective locals or organizational differences in the national unions of which they become a part. Rather, we

must consider whether changes have occurred in the rights and obligations of the union's leadership and membership, and in the relationships between the putative bargaining agent, its affiliate, and the employer. *NLRB v. Pearl Bookbinding Co., Inc.,* 1 Cir. 1975, 517 F.2d 1108, 1111–1112.

Only one factor cited by McDermott as demonstrating a discontinuity in bargaining agents requires detailed review: McDermott urges that a break is manifested by the dissolution of IAPD, Inc. as an apparent prerequisite to the grant of Local 1012's charter, and by the continuing maintenance of IAPD, Inc.'s assets in a separate account pending the eventual liquidation of the corporation.

The significance of the corporate dissolution is unclear only because of confusion as to the relationship of IAPD and IAPD, Inc. Although counsel for McDermott conceded that the two were separate organizations and that the unincorporated association was the certified bargaining agent prior to April, 1976, all IAPD correspondence in the record with regard to union activities bears the letterhead, "International Association of Professional Divers, Inc." MEBA granted a charter to the union under its corporate name. IAPD is described in its agreement with MEBA as an "incorporated association," and the corporate name appears in the heading on the union's constitution. There is thus evidence to indicate that IAPD, Inc. and IAPD are not two organizations, but one; if that were so, then the dissolution of the corporation might have substantially altered the legal relationships among the members, officers and the employer.

■ Substantial evidence, however, also supports the conclusion of the Board's majority that the bargaining agent has had a continuous, unbroken existence. First, a set of by-laws distinct from the union's constitution appears to have governed the organization's corporate incarnation. Second, President Woodhall's testimony be-

---

another area, address questions concerning the affiliation transfer to the union president and to an officer of the proposed new affiliate union.

In the present case, a full discussion was conducted by the membership, and no member of the United Brotherhood was present.

fore the NLRB suggests that the officers understood the organizations to be, and treated them as, separate. Finally, union and corporate meetings were convened and run separately, with separate notices of each sent to members, and separate minutes kept of each. These facts indicate that the IAPD was distinct from IAPD, Inc. and that only the unincorporated IAPD was the certified bargaining agent of McDermott's employees. Because only the unincorporated IAPD was the bargaining agent before April, 1976, the dissolution of IAPD, Inc. was not a significant change in the bargaining agent requiring us to view the non-corporate status of Local 1012 as a substantial change in the bargaining agent's structure.

There is also substantial evidence that the autonomy, dues structure, and leadership of the IAPD remained unchanged after July 11, 1975, despite its change in identity. IAPD members were required to file membership applications with the United Brotherhood, but acceptance was automatic. It appears that dues paid to the IAPD were considered good against obligations due the new Local 1012. Further, the United Brotherhood waived initiation fees for six months, thus permitting a transfer of membership from the IAPD without additional financial obligations. The differences between the organizations are superficial; no presently functioning IAPD remains to contest the certification of Local 1012.

Consequently, we find that the certification amendment granted to Local 1012 by the Board was valid.

### IV.

In addition to challenging the Board's decisions on their merits, McDermott contends that Local 1012's unfair labor charge filed on April 29, 1976, based on McDermott's refusal to bargain, was barred by the six-month statute of limitations provided under the National Labor Relations Act, § 10(b), because the employer's refusal to bargain on July 24, 1975 set the statutory limitations period running.

This circuit has twice held that each refusal to bargain by an employer under a duty to bargain is a violation of the employer's duty, and that the passage of more than six months' time from one such refusal does not bar action by the NLRB on a timely complaint based on a subsequent refusal. *NLRB v. Louisiana Bunkers, Inc.,* 5 Cir. 1969, 409 F.2d 1295, 1299–1300; *NLRB v. White Construction & Engineering Co.,* 5 Cir. 1953, 204 F.2d 950, 952–953. Our reasoning is not controlled by a conclusory labeling of the employer's duty or of his violation as a "continuing" one. Rather, we recognize that the primary purpose of the six-month rule is to assure prompt adjudications of disputes based on fresh evidence. McDermott's refusal to bargain was based on motives contemporaneous with its refusal to bargain on April 21, 1976. The filing of a complaint on April 29, 1976 brought those motives into question, and was timely with regard to the unfair labor charge alleged. *Cf., Local Lodge 1424 v. NLRB,* 1960, 362 U.S. 411, 416–422, 80 S.Ct. 822, 4 L.Ed.2d 832; *NLRB v. McCready and Sons, Inc.,* 6 Cir. 1973, 482 F.2d 872.

### V.

McDermott finally contends that its refusal to bargain in April, 1976 was justified because of the company's good faith doubt with respect to whether Local 1012 truly represented the majority of bargaining unit employees. This doubt was based on the alleged invalidity of pre-1975 representation; on a turnover of personnel at McDermott, including the departure of four persons in February, 1976, who had voted for the union; and, on Local 1012's alleged failure to demonstrate organizational strength in response to the company's recalcitrance.

These factors are insufficient to overcome the presumption of majority support that Local 1012 enjoys. During the first year following certification, a union enjoys an irrebuttable presumption of majority support. After that year, as in this case, the presumption is rebuttable and may be overcome by "objective evidence" proffered by an employer. *NLRB v. Newspa-*

pers, Inc., 5 Cir. 1975, 515 F.2d 334, 340–341. It is insufficient, however, that the employer merely intuits non-support; there must be convincing evidence. Refusal to bargain may not be based on a combination of employee turnover and some anti-union complaints, NLRB v. A. W. Thompson, Inc., 5 Cir. 1976, 525 F.2d 870, cert. denied, 1976, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 78, or on the termination of employment by a greater number of union adherents than the difference between the majority and minority votes in a representative election, NLRB v. Gulfmont Hotel Co., 5 Cir. 1966, 362 F.2d 588. Accord, Nazareth Regional High School v. NLRB, 2 Cir. 1977, 549 F.2d 873. See, NLRB v. Washington Manor, Inc., 6 Cir. 1975, 519 F.2d 750, in which the court held that a one hundred percent employee turnover during the term of a collective bargaining agreement, together with a close (27 to 24) representation election and alleged union inactivity, did not justify the employer's doubts as to the union's majority status "unaccompanied by objective evidence that new employees do not support the union," 519 F.2d at 753. The kind of "objective evidence" ordinarily sufficient to overcome a rebuttable presumption of majority support would be greater than fifty percent employee support for a decertification petition, Automated Business Systems v. NLRB, 6 Cir. 1974, 497 F.2d 262, or thirty percent support for decertification combined with other indicia of non-support, National Cash Register Co. v. NLRB, 8 Cir. 1974, 494 F.2d 189. The company's evidence falls short of these standards.

For the foregoing reasons, McDermott's refusal to bargain with Local 1012 in April, 1976 was unjustified and unlawful. McDermott's petition to set aside the Board's order is DENIED, and we direct that the order, in all respects, be ENFORCED.