## STAR MANUFACTURING COMPANY, DIVISION OF STAR FORGE, INC., Petitioner,

### v.

## NATIONAL LABOR RELATIONS BOARD, Respondent.

### No. 75–1907.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1976.

Decided June 25, 1976.

James A. Burstein, Chicago, Ill., for petitioner.

Elliott Moore, Deputy Assoc. Gen. Counsel, Robert G. Sewell, Anne E. Libbin, N.L.R.B., Washington, D. C., for respondent.

Before HASTINGS, Senior Circuit Judge, TONE, Circuit Judge, and NOLAND, District Judge.[*]

HASTINGS, Senior Circuit Judge.

Star Manufacturing Company, a division of Star Forge, Inc. (the Company), has petitioned us to review and modify an order of the National Labor Relations Board (the Board) issued against the Company on September 24, 1975. The Board has cross-petitioned for enforcement, all pursuant to the National Labor Relations Act, as amended, 29 U.S.C. § 151, et seq. (the Act). The Board's Decision and Order are reported at 220 NLRB No. 76 (1975).

The primary question for consideration is whether there is substantial evidence in the record as a whole to support the Board's finding that the Company violated Section 8(a)(5) and (1) of the Act by failure to bargain in good faith and by withdrawing recognition from the Union. In short, at the time it withdrew recognition from the Union, did the Company have a good faith doubt that the Union represented a majority of the employees in the appropriate collective bargaining unit? In due course, we shall also consider other subsidiary questions relating to alleged violations of Section 8(a)(1) and (3) of the Act in the Company's treatment of a single employee, Jim Scott.

The Company is engaged in the manufacture of parts for agricultural equipment in Carpentersville, Illinois. The Union in this case for all practical purposes is the Metal Trades Department of the AFL, and its successor organization of the AFL–CIO, including affiliates. The proceeding before the Board was conducted on a consolidated case and a consolidated complaint.

In 1942, the Union was certified as the exclusive collective bargaining representative of all factory employees at the Company's facility at Carpentersville. From 1942 to 1971, successive collective bargaining agreements between the parties were entered into covering all of the factory employees at the Carpentersville facility. In 1971, the Company entered into a collective bargaining agreement with the Union, effective to September 1, 1974. There were certain automatic yearly renewal provisions not relevant to the issues before us. There was a history of an amicable relationship between the parties prior to the Company's withdrawal of recognition.

The 1971 collective bargaining agreement covered all factory employees at the Carpentersville facility, excluding office employees, company executives, shop clerks, foremen, and others in a supervisory position or in confidential relations with the management. The agreement did not contain standard union security provisions, but it did contain fairly typical maintenance of membership provisions with appropriate escape clauses.

During May through July 1974, the Company had about 84 employees in the bargaining unit. On June 11, 1974, agreeable with the terms of the 1971 contract, the

[*] The Honorable James E. Noland, United States District Judge for the Southern District of Indiana, is sitting by designation.

Union requested, in writing, a meeting to begin negotiations for a new contract, the current one expiring on September 1, 1974. On June 18, 1974, the Company replied in writing, demanding from the Union, under the terms of the contract, a list of the Union membership. The Company repeated this request on July 8, 11, 15 and 19, assuring the Union it would meet with the Union upon receipt of the membership list. The Union never produced the membership list as required by the contract.

On July 30, the bargaining unit comprised 83 employees. Company records indicated that only a small percentage were members of the Union. Only 22 individuals, 26.5 per cent of the unit, had authorized the deduction of union dues from their wages under the checkoff provision of the contract. On brief, the Company indicated that this number had further diminished to 15 employees.

As a further objective indication that the Union no longer represented a majority of its unit employees, the Company notes that the Union had failed to appoint a steward for over an entire year. Employee Frank Hayden initially began processing a grievance following the demand for bargaining negotiations. Hayden was not designated as a Union steward until the Company required notice of his authority to act.

Although the contract required that overtime be distributed as evenly as possible among all employees in each department, no grievance was ever filed by the Union with respect to the Company's failure to observe this policy.

The grievance Hayden processed in June 1974, alleging an unlawful pay reduction, was the first one filed during the life of the 1971 contract. Neither that grievance, nor one other filed thereafter, was ever processed beyond the first stage of the contract grievance procedure even though the first step dispositions in each case were unfavorable to the grievants. After the denial of the first grievance he filed, Hayden stated that he did not know what next to do.

Alternatively, Union business representative Haderly responded to the Company's membership list requests by stating that the Union would furnish the membership list when the Company furnished data on pensioners, or that it would furnish the list after an unnamed individual at a nearby factory returned to work. On July 30, 1974, Haderly stated to Company President Ward that he would not furnish the membership list. Ward responded, "If we don't have a list, we aren't going to have a meeting."

Believing that there was a good faith doubt that the Union no longer represented a majority of its unit employees, but was in fact a minority union, the Company withdrew its recognition from the Union on July 30, 1974.

The case was first heard on November 20, 21 and 22, 1974, before Jerry B. Stone, Administrative Law Judge (ALJ), in Chicago, Illinois. The ALJ issued a Decision and recommended Order on March 31, 1975. He concluded that the Company had refused to bargain in good faith with the Union; that it did not have a good faith doubt as to the Union's majority status at any time; and that its actions were violative of Sections 8(a)(5) and (1) of the Act. The ALJ further found and held that the Company violated Section 8(a)(1) and (3) of the Act by: (1) the reduction in employee Jim Scott's wages because of his union activity; (2) the interrogation of Scott as to why he had joined the Union; and (3) the solicitation of employee withdrawal from the Union by Plant Manager Danielson.

The ALJ recommended that an appropriate cease and desist order be entered; that employee Jim Scott be made whole for loss of pay; that the Company, upon request, bargain in good faith with the Union; and that appropriate notices be posted. The ALJ further recommended dismissal of the complaint as to other unfair labor practices alleged therein.

A three-member panel of the Board, consisting of Members Fanning, Penello and Chairman Murphy, considered the exceptions to the decision of the ALJ filed by the Company and the answer filed by the General Counsel. Members Fanning and Penello accepted the credibility findings of the

ALJ; dismissed an allegation as to an illegal promise of benefits made to Scott by Plant Manager Danielson on May 29, 1974, which the ALJ had found to be in violation of Section 8(a)(1); disagreed with the ALJ's finding an adverse implication in the Company's demand for the membership list from the Union as the contract provided, but found that the failure to provide the list had no relation to the Company's duty to bargain with the Union and that the absence of the list afforded no defense to the Company's refusal to bargain. Otherwise, the two members on September 24, 1975, adopted the ALJ's recommended Order, as modified, as the Board's order, and ordered appropriate notices posted.

Chairman Murphy dissented in part and concurred in part and filed a detailed memorandum opinion.

With reference to the Section 8(a)(1) and (3) violation found by the panel majority as to employee Scott, the Chairman stated: "While I concur in my colleagues' finding * * * in my opinion these violations were isolated occurrences which involved only 1 employee out of a work force of over 80 employees and cannot reasonably be adjudged to have caused any significant erosion of union strength. Therefore, I would find these unfair labor practices were of a minimal nature and did not 'taint' the objective consideration on which Respondent [the Company] relied in withdrawing recognition from the Union." Citing *Taft Broadcasting, WDAF-TV, AM-FM*, 201 NLRB 801 (1973).

In a marked dissent from the majority, Chairman Murphy found that the Company withdrew its recognition of the Union on July 30, 1974, and thereafter refused to bargain with the Union "because of a reasonably based doubt of the Union's majority status." The Chairman noted that under established Board precedent a certified union, upon the expiration of the first year

following its certification, enjoys a rebuttable presumption that its majority representative status continues. *Celanese Corporation of America*, 95 NLRB 664 (1951).[1] Further, to rebut that presumption, the employer need not prove that the union no longer represents a majority of the employees, but only that at the time it refused to bargain there were sufficient objective considerations to support a reasonable doubt of the union's majority status. *Orion Corporation*, 210 NLRB No. 71 (1974). The Chairman then concluded that, when viewing the present circumstances in their entirety, it was clearly established that the Company had met that test.

The dissent then set out the facts in the record relating to the Company's objective considerations, much as we have earlier recounted them here. It was pointed out that, in addition to the staleness of the Union's certification and its refusal to submit a list of its membership, there were other significant objective indications that the Union no longer represented a majority of the unit employees. During the term of the contract, considerable changes had occurred in the composition of the bargaining unit. Employee terminations within the factory unit increased at a rapid rate in relation to the unit size. There were 180 unit terminations in 1972, while during the first seven months of 1974 there were 133 unit terminations. The checkoff percentages were set out. The implications of such data could not be ignored. The sole evidence readily available to the company as a reliable measure of union support has been held to be that provided by the employees' checkoff authorizations. *Convair Division of General Dynamics Corporation*, 169 NLRB 131 (1968).[2] It was also noted that our court in *N.L.R.B. v. H. P. Wasson & Co.*, 7 Cir., 422 F.2d 558, 561 (1970), held that in considering whether a union had lost its majority status, the large turnover and

---

1. *Brooks v. N.L.R.B.*, 348 U.S. 96, 98, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

2. *See also Otto Klein, et al., d/b/a Artiste Permanent Wave Company*, 172 NLRB 1922 (1968), and *Hayworth Roll and Panel Company*,

130 NLRB 604 (1961), where the fact that the union had checkoff cards from *less* than a majority of the employees was a decisive factor in the Board's dismissal of the Section 8(a)(5) complaint.

the decrease in checkoff cards could reasonably give rise to genuine doubts.[3]

The Chairman was further influenced by the Company's reliance on the cumulative effect of all the several considerations in support of its good faith doubt of the Union's majority status.[4] Notice was also taken of Union Steward Hayden's several expressed opinions of the Union's weakness.[5]

In reviewing all of the objective considerations and more, above set out, Chairman Murphy concluded and found that "at the time it withdrew recognition, [the Company] had valid reasons for doubting the Union's majority status and thus, in the absence of proof to the contrary, I find that [the Company] lawfully refused to bargain." Accordingly, she would have dismissed that portion of the complaint.

Based upon our review of the record as a whole, the briefs of the parties and the oral argument, we find ourselves in agreement with the views of Chairman Murphy. We adopt her well reasoned dissenting opinion as the opinion of this court. Reported at 220 NLRB No. 76 (1975).

For a thorough analysis of this primary question before us, we find former Chief Judge Swygert's able opinion in *Ingress-Plastene, Inc.,* 430 F.2d at 545–8, to be controlling on the Section 8(a)(5) violation. Therefore, we deny enforcement of that portion of the Board's order which was predicated on the Company's alleged refusal to bargain. In all other respects, the order will be enforced.

ENFORCEMENT DENIED IN PART AND GRANTED IN PART.

---

**3.** See *Orion Corporation v. N.L.R.B.,* 7 Cir., 515 F.2d 81 (1975), and *National Cash Register Company v. N.L.R.B.,* 8 Cir., 494 F.2d 189 (1974).

**4.** See *Ingress-Plastene, Inc. v. N.L.R.B.,* 7 Cir., 430 F.2d 542, 546 (1970).

**5.** See *Dixie Gas, Inc.,* 151 NLRB 1257, 1259 (1965); *Viking Lithographers, Inc.,* 184 NLRB 139 (1970).