**NATIONAL CAR RENTAL SYSTEM, INC., Car Rental Division, Petitioner,**

**v.**

**The NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 78–1579.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1979.

Decided March 8, 1979.

James G. Baker of Spencer, Fane, Britt & Browne, Kansas City, Mo. (argued), and Harry L. Browne, Kansas City, Mo., on brief, for petitioner.

Arnold B. Podgorsky, Atty., N.L.R.B., Washington, D.C. (argued), John S. Irving, John E. Higgins, Jr., Robert E. Allen and Elliott Moore, Washington, D.C., on brief, for respondent.

---

* The Honorable BRUCE M. VAN SICKLE, United States District Judge for the District of North Dakota, sitting by designation.

1. For some unexplained reason National does not argue that this indicated that only nine

Before ROSS and McMILLIAN, Circuit Judges, and VAN SICKLE,* District Judge.

ROSS, Circuit Judge.

This case is here on a petition for review filed by National Car Rental System, Inc. (National), relating to an order of the National Labor Relations Board (Board), directing National to bargain with General Drivers and Warehousemen Local Union No. 498, International Brotherhood of Teamsters (union). The Board filed its cross-application for enforcement of the order.

The union was certified by the Board in 1963 as the exclusive collective bargaining agent of a unit composed of general garage and parking lot attendants at National's two Kansas City facilities. Several collective bargaining agreements were executed by National and the union, the last of which expired on December 15, 1976. Negotiations for a new contract were held from January 6, 1977, to March 29, 1977, at which time all ten of the bargaining unit employees commenced a strike. Nothing further happened until May 13, 1977, when a meeting was scheduled with the Federal Mediation and Conciliation Service. However, the meeting was postponed when Mr. Mott, one of the union officers, was unable to attend.

On May 20 National sent registered, return receipt letters to each of the ten striking employees. All of these letters were received by the employees, except for one letter which was returned marked "Unclaimed."[1] The letters asked the employees to return to work on May 24, and advised them that, "in the event you decide not to report for work at that time, we will legally commence hiring permanent replacements to do the work which you have chosen not to perform."

employees of the original ten continued to be available for return to work or for a vote in a representation election. We therefore ignore it in our analysis.

On May 24 none of the ten striking employees returned to work, and approximately 20 job applicants arrived to interview for employment.

By the end of May National had employed ten men as permanent replacements for all of the workers out on strike. At the outset of another scheduled negotiating session on June 2, 1977, National handed the union's bargaining agent a letter stating that National did not believe that the union still represented a majority of its employees. The company then refused to bargain further.

There were no further developments until July when a new union president was elected and the union again requested a bargaining meeting. National refused the request and restated its position that the union no longer represented a majority of its employees.

The company filed a petition for a representation election on July 22, 1977. The Board issued an unfair labor practice complaint on September 14, 1977, and a hearing was held on December 9, 1977. On March 2, 1978, the Administrative Law Judge (ALJ) issued his decision that National had engaged in unfair labor practices violative of sections 8(a)(1) and (5) of the National Labor Relations Act and that this conduct converted the economic strike into an unfair labor practice strike. He recommended that a bargaining order be issued. The Board agreed and, with only one slight modification, ordered National to bargain and to cease violating sections 8(a)(1) and (5) of the Act. It also ordered the posting of the usual notice.

The primary question for decision by this court is whether there is substantial evidence in the record as a whole to justify the Board's finding that National did not have a good faith doubt that the union still represented a majority of its employees on June 2, 1977, and thereafter. If National did, in fact, have a good faith doubt that the union still represented a majority of its employees, it was justified in refusing to bargain further. *See National Cash Register Co. v. NLRB*, 494 F.2d 189, 193 (8th Cir. 1974) and cases cited therein. (Not cited by either party.) If, in fact, National did not have a good faith doubt, the Board's bargaining order was an appropriate remedy.

The law in this circuit relating to a situation such as this was set forth in *National Cash Register* as follows:

In the absence of unusual circumstances and where a union has been certified as the exclusive bargaining unit, then under the "certification year rule" the majority status of that union is irrebuttably presumed for a reasonable period, ordinarily one year after certification. *Brooks v. N.L.R.B., supra*, 348 U.S. [96] at 98, 75 S.Ct. 176 [99 L.Ed. 125]; *Franks Bros. Co. v. N.L.R.B.*, 321 U.S. 702, 705, 64 S.Ct. 817, 88 L.Ed. 1020 (1944). After the expiration of the year or a reasonable period, the presumption of majority status continues, but is then normally rebuttable by a showing that the union no longer commands a majority, *or by the employer's production of sufficient evidence to cast serious doubts thereon*, in which event the presumption then loses its force and the General Counsel must come forward with the evidence that on the refusal to bargain date the union in fact did represent a majority of employees in the appropriate unit, *N.L.R.B. v. Little Rock Downtowner, Inc., supra*, [8 Cir.], 414 F.2d [1084] at 1091, or that the refusal to bargain was not predicated upon a good faith and reasonably grounded doubt of the union's continued majority status. *Terrell Machine Co. [v. N.L.R.B.], supra*, [4 Cir.], 427 F.2d [1088] at 1090; *N.L.R.B. v. Arkansas Grain Corp., supra*, [8 Cir.], 390 F.2d [824] at 828.

*Id.* at 193–94. (Emphasis supplied.)

In support of National's contention that it had a good faith doubt of the union's majority status, National argues as follows:

A. The company had only ten employees and all of these employees had been permanently replaced during an economic strike.

B. Each of the ten employees had to cross the picket line in order to make application for employment.

C. Each of the ten employees had to cross the picket line each day in order to work.

D. There was no showing at the hearing that the new employees were contacted by the union regarding membership therein; and no showing that any of the new employees would support the union.

The Board presented no evidence directly bearing upon whether the union still had majority status but relied upon the Board created rule set forth in a case decided by the Board *after* National notified the union of its good faith doubt of continued majority representation. *Windham Community Memorial Hospital*, 230 N.L.R.B. 1070, enforced, 577 F.2d 805 (2d Cir. 1978).

In *Windham* the Board held that new employees, in a situation such as this, are presumed to support the union in the same ratio as the employees they have replaced. If this presumption were to be employed here, we would reach the ridiculous result of presuming that all of the ten new employees favored representation by the union even though they had crossed the union's picket lines to apply for work and to report to work each day after they were hired. This presumption of the Board is not specifically authorized by statute and is so far from reality in this particular case that it does not deserve further comment.

Prior to the *Windham* decision the Board decided *Arkay Packaging Corp.*, 227 N.L.R.B. 397 (1976), *petition for review denied*, 575 F.2d 1045 (2d Cir. 1978). At the time National gave notice of its good faith doubt regarding the union's majority status among its employees, National claims to have relied on the rule of *Arkay, supra*, 227 N.L.R.B. 397 in refusing to continue bargaining.

In that case the Board held that the company had established its good faith doubt of the union's majority status and was therefore justified in refusing to bargain with the union because "in the strike situation present in this case, it would be wholly unwarranted and unrealistic to presume as a matter of law that, when hired, the replacements for the union employees

who had gone out on strike favored representation by the Unions to the same extent as the strikers." *Id.* at 397–98.

The Board recognized that striker replacements cannot be presumed to support the striking union in *S & M Manufacturing Co.*, 172 N.L.R.B. 1008, 1008–09 (1968) and *Titan Metal Manufacturing Co.*, 135 N.L.R.B. 196, 215 (1962), both of which cases involve strike situations. In each case the Board held that the employer was justified in refusing to bargain with the union and declined to find them in violation of sections 8(a)(1) or 8(a)(5) of the Act.

In its review of the *Arkay* case, with issues similar to those facing this court, the Second Circuit stated:

> With respect to the eleven replacements, the Board majority recognized the presumption that new employees will support the union (for the particular bargaining unit) in the same ratio as those employees whom they have replaced, *but said this only obtained in the "normal turnover situation" and that it would be "wholly unwarranted and unrealistic" to engage in such a presumption in the present factual situation.*

*New York Printing Pressmen v. NLRB*, 575 F.2d 1045, 1048 (2d Cir. 1978) (footnotes omitted). (Emphasis supplied.)

We agree with the rationales of these cases. In our opinion the presumption that new employees hired in the normal employee turnover situation support the union in the same ratio as those they have replaced, *Laystrom Manufacturing Co.*, 151 N.L.R.B. 1482, *enforcement denied on other grounds*, 359 F.2d 799 (7th Cir. 1966) does not apply where the "turnover" results from the hiring of all new permanent replacements for all striking employees. "[I]f a new hire agrees to serve as a replacement for a striker (in union parlance, a strike breaker, or worse,) it is generally assumed that he does not support the Union and that he ought not to be counted toward a Union majority." R. Gorman, Labor Law 112 (1976).

If, in this case, the replacements had been hired over a period of time without having to cross picket lines to apply for or attend work, the presumption might have some validity. But here, as in *Arkay, supra,* 227 N.L.R.B. at 397, it is "wholly unwarranted and unrealistic" to engage in such a presumption.

■ We conclude that there was no substantial evidence to support the Board's conclusion that National did not have a good faith doubt that the union continued to represent a majority of its employees. A Board created presumption does not rise to the level of "substantial evidence." When we consider the reasons given by National together "we believe that good faith doubt has been demonstrated at least to the point of requiring the General Counsel to come forward with evidence that the union did represent a majority of the employees in the unit on the refusal to bargain date." *National Cash Register Co. v. NLRB, supra,* 494 F.2d at 194. *Accord, Automated Business Systems v. NLRB,* 497 F.2d 262, 270 (6th Cir. 1974).

■ Therefore, we decline the Board's request to enforce its order since an employer with a reasonably grounded belief that a union does not represent a majority of its employees cannot be found guilty of a section 8(a)(5) or 8(a)(1) violation. *National Cash Register Co. v. NLRB, supra,* 494 F.2d 189; *NLRB v. Dayton Motels, Inc.,* 474 F.2d 328, 331–32 (6th Cir. 1973). It follows that the company has not committed an unfair labor practice in refusing to bargain with the union. *NLRB v. Gopher Aviation, Inc.,* 402 F.2d 176, 179 (8th Cir. 1968). Furthermore, the strike retained its status as an economic strike since conversion into an unfair labor practice strike occurs only when an employer's unfair labor practice aggravates or prolongs an economic strike. *General Teamsters, Local 992 v. NLRB,* 138 U.S.App.D.C. 312, 317, 427 F.2d 582, 587 (1970).

Enforcement denied.