**CURTIN MATHESON SCIENTIFIC, INC., Petitioner Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent Cross–Petitioner.**

No. 88–4012.

United States Court of Appeals, Fifth Circuit.

Nov. 4, 1988.

Rehearing and Rehearing En Banc Denied Dec. 22, 1988.

---

James V. Carroll, III, Debra S. Tellez, Houston, Tex., for petitioner-cross-respondent.

Eric H. Nelson, Houston, Tex., for intervenor.

Charles P. Donnelly, Jr., Aileen Armstrong, Deputy Assoc. Gen. Counsel, N.L.R.B., Peter D. Winkler, Office of Gen. Counsel, Washington, D.C., for respondent-cross-petitioner.

Bob Casey, Houston, Tex., for other interested parties.

Before WILLIAMS and GARWOOD, Circuit Judges, and NOWLIN,* District Judge.

NOWLIN, District Judge:

This case is before the Court on the petition of Curtin Matheson Scientific, Inc., for review of the unfavorable decision of the National Labor Relations Board (the Board), and the Board's cross-application for enforcement. The Board found that Curtin Matheson Scientific, Inc. (the Company) violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), by withdrawing recognition of Local 968, General Drivers, Warehousemen and Helpers (the Union) as the representative of the Company's employees, by failing and refusing to furnish the Union with certain information requested, and by failing and refusing to execute a written contract embodying a collective-bargaining agreement found to have been reached on July 16, 1979.

The Board ordered the Company to desist from these unfair labor practices. As affirmative relief, the Board ordered the Company to recognize and, on request, to bargain with the Union concerning the terms and conditions of the employment of

---

* District Judge of the Western District of Texas, sitting by designation.

the bargaining unit employees, and to provide the information requested. The Board further ordered the Company to execute the collective-bargaining agreement if the Union so requested, and to give retroactive effect to the agreement's terms and conditions and make the bargaining unit employees whole for any losses they suffered as a result of the Company's refusal to sign the agreement. If the Union elected not to request execution of the agreement, then the Board ordered the Company to bargain in good faith with the Union concerning the terms and conditions of a new agreement, and to sign a contract embodying any agreement reached. Finally, the Company was required to post copies of a remedial notice to employees. We reverse.

## I.

The Company trades in laboratory instruments and supplies, and maintains a warehouse in Houston, Texas, where the acts which are the basis of this case occurred. On April 15, 1970, the Board certified Local 968, General Drivers, Warehousemen and Helpers, which was affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO (the Union), as the collective-bargaining agent for the Company's production and maintenance employees. On May 21, 1979, the latest collective-bargaining agreement between the parties expired. The Company and the Union had not reached contract agreement when, on May 25, 1979, the Company made a final offer. The Union rejected this offer on May 29, 1979. A lockout of all twenty-seven bargaining unit employees lasted from June 4 to June 12, 1979. On June 12, 1979, the Company's offer was renewed and again rejected.

On June 13, 1979, the Union began an economic strike which lasted until July 16, 1979. Five of the twenty-seven bargaining unit employees immediately crossed the picket line and returned to work. The record contains no evidence of picket line or other strike-related violence or threats during the course of the strike. On June 17, 1979, the Company put into effect the wage schedule proposed in its May 25, 1979 offer. On June 25, 1979, with the strike still in progress, the Company hired twenty-nine new employees to replace the twenty-two strikers; the additional seven employees were hired to compensate for the new workers' inexperience and to allow for attrition.

On July 16, 1979, the Union ended its strike, offered unconditionally to have the striking employees return to work, and informed the Company that it was accepting the May 25, 1979 offer. The Union asked the Company to execute the contract on July 19, 1979. Then, on July 20, 1979, the Company notified the Union that the May 25, 1979 offer was not available, and because it had doubts as to the Union's majority status, that the Company was withdrawing recognition and refusing to bargain further. On July 20, 1979, there were nineteen employees still on strike, and twenty-five striker replacements and the five cross-over employees working for the Company in bargaining unit positions.

On July 20, 1979, the Union also requested that the Company furnish information regarding the total number of bargaining unit employees on the payroll, and the job classification and seniority of each of these employees. The Company did not furnish this information.

The Union filed an unfair labor practices charge with the Board on July 30, 1979, alleging violations of sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5). The Board issued a complaint against the Company on September 7, 1979. Administrative Law Judge Martin S. Bennett (the ALJ) heard the matter on June 10, 1980. In his November 20, 1980 decision, the ALJ held that the Company had a reasonably based good-faith doubt as to the Union's majority status, and dismissed the entire complaint on that ground.

The Board reviewed the ALJ's decision, and on December 16, 1987, held that the Company had not made an adequate showing of good faith doubt. *See Curtin Matheson Scientific, Inc.*, 287 NLRB No. 35 (1987). The Board concluded that the

Company had violated sections 158(a)(1) and (5) of the Act by withdrawing Union recognition, by failing and refusing to furnish requested information, and by failing and refusing to execute the May 25, 1979 contract offer accepted by the Union on July 16, 1979. The Company timely appealed, invoking this Court's appellate jurisdiction under 29 U.S.C. §§ 160(e) and (f).

## II.

We have previously established a framework for evaluating a company's withdrawal of recognition of a union. In *NLRB v. Randle-Eastern Ambulance Service, Inc.,* 584 F.2d 720, 727–28 (5th Cir.1978), we provided:

> In the absence of special circumstances, a Union's majority status is irrebuttably presumed for a period of one year following certification or voluntary recognition. *See Brooks v. NLRB,* 1954, 348 U.S. 96, 103–04, 75 S.Ct. 176 [181–82], 99 L.Ed. 125 (certification); *NLRB v. Physicians & Surgeons Community Hospital,* 5 Cir., 1978, 577 F.2d 305, 307 (voluntary recognition). After the expiration of the certification year, the presumption of the Union's continuing majority support continues but becomes rebuttable. *J. Ray McDermott & Co. v. NLRB,* 5 Cir., 1978, 571 F.2d 850, 858; *NLRB v. Gulfmont Hotel,* 5 Cir.1966, 362 F.2d 588. A good faith doubt of the union's majority status is a defense to a refusal to bargain charge based on the withdrawal of recognition. That doubt must rest on 'objective evidence.' *J. Ray McDermott, supra,* and 'may not depend solely upon unfounded speculation or a subjective state of mind.' *Gulfmont Hotel, supra,* at 589. But the employer need not conclusively demonstrate that a majority of his employees no longer desire to be represented by the Union.

Accordingly, after the expiration of the collective-bargaining agreement on May 21, 1979, the Union enjoyed a rebuttable presumption that its majority status was continuing. The Company was justified in withdrawing recognition from the Union if it overcame the presumption of majority support by affirmatively establishing either: (1) at the time of withdrawal of recognition, the Union in fact no longer enjoyed majority status; or (2) the Company's refusal to bargain was predicated upon a reasonably grounded doubt as to the Union's continued majority status asserted in good faith, based upon objective considerations, and raised in a context free of employer unfair labor practices. It is the second ground upon which the Company relied in withdrawing recognition of the Union.

In reviewing the Board's findings and conclusions, we are limited by the substantial evidence rule, and should not review the charge *de novo. Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *Randle-Eastern,* 584 F.2d at 725; 29 U.S.C. § 160(e). The Company asserts that its doubt was arrived at in good faith, based on the following factors: (1) the hiring of permanent replacements for all of the strikers and anti-union statements made by permanent replacements; (2) employees crossing the picket line; (3) strong anti-union statements and statements of non-support by cross-over employees and by striking employees; (4) expressions of Union officials concerning the weakness of the Union and lack of employee support, *e.g.,* "the employees didn't want anything to do with the Union;" and (5) Union inactivity and lack of communication with the Company. The ALJ's findings of fact were not overruled by the Board, and the facts as stated by the Board are uncontested by the parties.

On July 20, 1979, nineteen of the original twenty-two striking workers were still on strike, and twenty-five of the original twenty-nine striker replacements and the five cross-over employees were still working, for a total of forty-nine employees in the bargaining unit. *See C.H. Guenther & Son, Inc. v. NLRB,* 427 F.2d 983, 986–87 (5th Cir.), *cert. denied,* 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed. 246 (1970); 29 U.S.C. § 152(3). Accordingly, before withdrawing recognition, the Company was required to have good faith doubt as to Union support

by twenty-five of the employees. The Company's source of information regarding Union support was Elizabeth Price, the director of employee relations. In the two months prior to July 20, 1979, she had conversations with two of the cross-over employees, four of the strikers, and one striker replacement.

Ms. Price spoke with Tony Lopez and Bill Lee, two of the five cross-over employees. Both men were not Union members. Mr. Lopez talked twice with Price, indicating that the Union had done nothing for the employees and that the Union's business representative was not doing his job. Mr. Lopez also stated that he had not and would not pay Union dues because he would not support the Union in any way. Mr. Lee stated that he did not pay Union dues because he did not support the Union and believed that the Union had not done anything for the employees.

The four strikers who crossed the picket line to speak with Ms. Price were Shady Goodson, J.R. Blackshire, Raymond Brunner, and Clint Waller. Chief Shop Steward Goodson, who was a member of the Union's negotiating committee, told Ms. Price that he was speaking on his own behalf; and although other striking employees shared his sentiments, he said he was not speaking as a representative of the Union employees or the Union. He felt that only the Union wanted the strike, not the employees. He was having difficulties manning the picket line. At a later time, Mr. Goodson requested reinstatement; and on July 19, 1979, he resigned. The Company would have been justified in giving significant weight to Mr. Goodson's comments, even though he was not speaking in his official capacity. *See Randle–Eastern*, 584 F.2d at 729; *Star Manufacturing Co. v. NLRB*, 536 F.2d 1192, 1196 (7th Cir. 1976); *Lodges 1746 and 743, International Association of Machinists v. NLRB*, 135 U.S.App.D.C. 53, 57–58, 416 F.2d 809, 812–13 (1969), *cert. denied*, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed. 752 (1970).

Mr. Blackshire, a former shop steward, crossed the picket line to request reinstatement. He was angered by the Union first failing to pay him for walking the picket line, and then deducting Union dues from his payments. After requesting reinstatement, Mr. Blackshire spoke with friends working in the Company's warehouse. After a few minutes, he called Ms. Price over, and told her there was no Union anymore, that the people were not supporting it. Mr. Blackshire also stated that there were other striking employees who wanted to return to work.

Mr. Brunner crossed the picket line to express his intention of retiring early because he did not want to work with the Union again. Finally, Mr. Waller indicated that he was not manning the picket line and would continue not to do so. He felt the Union was not representing the employees, and wanted "this thing," apparently the strike, to be over. He indicated a desire to withdraw from the Union.

Twenty-nine striker replacements were hired on June 25, 1979. There is no evidence of the Union attempting to contact any of the striker replacements during the strike. On July 19, 1979, Ms. Price spoke with one of the replacements, David Schneider. Mr. Schneider stated that he had experiences as a union and non-union worker. His assessment was that the Union did not represent the Company, and that the Union was not needed.

The Board relied on the standard set forth in *Buckley Broadcasting Corp. (Station KKHI)*, 284 N.L.R.B. No. 113 (1987), in ruling that the Company did not have reasonably grounded good-faith doubt as to the Union's majority status. In *Station KKHI*, the Board rejected the presumption that striker replacements favor the union, and rejected the contrary assumption that striker replacements repudiate the union as their collective-bargaining representative. The Board concluded by declining to maintain or create any presumption regarding striker replacements' union sentiments. The Board contends that *Station KKHI* represents a comprehensive reconsideration of the Board's approach to the characterization of striker replacements in withdrawal of recognition cases. Prior to *Station KKHI*, the Board states that it presumed

striker replacements desired to be represented by the incumbent union in the same ratio as the employees they replaced, a presumption that we discredited ten years ago in *Randle–Eastern.*

We do not agree that *Station KKHI* establishes a new standard because operationally the *Station KKHI* standard has the same effect as the presumption that striker replacements support the union in the same ratio as the employees they replace. Under the *Station KKHI* holding that no presumption will be made about striker replacements' support or non-support of the union, the general presumption of continuing union majority still applies. Under either standard, the Company is required to have objective evidence regarding the striker replacements' non-support in order to count them as employees whom the Company doubts support the Union.

In *Randle–Eastern,* we considered the presumption that new employees support the union in the same ratio as those they have replaced, and rejected its application where employee turnover results from the replacement of strikers. *Randle–Eastern,* 584 F.2d at 728. We also adopted the Gorman presumption,[1] stating that it was "especially true," where the striker replacements were the victims of picket line violence, and the Union was bargaining for the discharge of the striker replacements to make room for returning strikers. *Id.*

The Company contends that the Gorman principle applies even in the absence of special circumstances such as those present in *Randle–Eastern.* Therefore, even though there was no picket line violence or negotiating to discharge the striker replacements, the Company argues that it was justified in counting the twenty-two striker replacements as not supporting the Union on July 20, 1979.

■ We hold that the Company was justified in doubting that the striker replacements supported the Union in this context. Over eighty percent of the bargaining unit work force (twenty-two of twenty-seven employees) was replaced on June 25, 1979. Where such a substantial percentage of the bargaining unit employees is replaced on the same day, and the striker replacements cross a picket line, violent or not, to report to work each day, the Company is justified in counting the striker replacements as employees whom they doubt support the Union. This holding is in accord with the Eighth Circuit's opinion in *National Car Rental System, Inc. v. NLRB,* 594 F.2d 1203 (8th Cir.1979). The Eighth Circuit adopted the Gorman presumption where all ten of the original bargaining unit employees commenced a strike and were subsequently replaced by permanent employees who all began work within a one-week period and crossed picket lines to apply for and report to work. *See also Soule Glass & Glazing Co. v. NLRB,* 652 F.2d 1055, 1109–10 (1st Cir.1981).

■ We therefore reverse the Board's finding that the Company violated sections 8(a)(1) and (5) by withdrawing recognition of the Union. The Court also reverses the Board's findings that the Company violated these sections by refusing and failing to furnish the Union with certain information requested, and by failing and refusing to execute a written contract embodying a collective-bargaining agreement the Board found was reached on July 16, 1979. The information at issue was requested on July 20, 1979, the same day that the Company justifiedly withdrew recognition of the Union as the employees' collective-bargaining representative. Since an employer is only obligated to provide its employees' bargaining representative with information necessary and relevant to fulfill its statutory collective-bargaining function, the Company did not commit an unfair labor practice by refusing to provide the information requested. By the same logic, no violation of sections 8(a)(1) and (5) occurred when the Company refused to execute a contract

---

**1.** R. Gorman, Labor Law 112 (1976): "[I]f a new hire agrees to serve as a replacement for a striker (in union parlance, a strike breaker, or worse), it is generally assumed that he does not support the Union and that he ought not to be counted toward a Union majority."

when the Union attempted to accept the Company's May 25, 1979 offer.

Enforcement denied.

JERRE S. WILLIAMS, Circuit Judge, dissenting:

I would enforce the Board's order requiring Curtin Matheson Scientific to recognize and, on request, bargain with the Union. I conclude that the Board's refusal to attach presumptive significance to the hiring of replacement workers is a reasonable policy choice which is not inconsistent with our prior decisions. Moreover, there is sufficient evidence to support the Board's determination that the Company's withdrawal of recognition in this case was not justified. Accordingly, I must respectfully dissent.

## I. Standard of Review

As the majority correctly notes, but as I wish to emphasize, this Court does not review the Board's decision *de novo*. We do not reach our decision on the facts before us. Instead, we are limited by the substantial evidence rule, an inquiry as to whether the Board's decision is supported by "substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). The simple phrase "substantial evidence", however, does not completely describe the standard of review in this particular case where we consider not only the Board's factual conclusions but also its evolving policy regarding the significance attached to the hiring of replacement workers.

A great degree of deference is owed to the Board's policy choices, even when "the Board might have struck a different balance from the one it has, and it may be that some or all of us would prefer that it had done so." *Charles D. Bonanno Linen Service v. NLRB*, 454 U.S. 404, 413, 102 S.Ct. 720, 725, 70 L.Ed.2d 656 (1982). In-

deed, when the Board's policy decision "is not an unreasonable or unprincipled construction of the statute [it] should be accepted and enforced." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). Moreover, we must remember that the Board is entitled to change its views, and the same deference must be shown to any new policy. *NLRB v. Local 103, Ironworkers*, 434 U.S. 335, 351, 98 S.Ct. 651, 660–61, 54 L.Ed.2d 586 (1978). In short, "the Board may alter its standards provided the new standards are rational and consistent with the Act." *Hotel Employees and Restaurant Employees Union, Local 11 v. NLRB*, 760 F.2d 1006, 1008 (9th Cir.1985).

## II. The Impact of Hiring Replacement Workers

The outcome of this case turns on the significance attached to the hiring of permanent replacement workers during an economic strike.[1] We start with the statutory definition of employee which includes "any individual whose work has ceased as a consequence of or in connection with, any current labor dispute ..." 29 U.S.C. § 152(3). Then the statute itself makes clear that employees who have been "replaced" are nevertheless still eligible to vote in the bargaining unit. 29 U.S.C. § 159(c)(3) provides: "Employees engaged in an economic strike who are not entitled to reinstatement (because they have been replaced etc.) shall be eligible to vote under such regulations as the Board shall find are consistent with the purposes and provisions of this subchapter in any election conducted within twelve months after the commencement of the strike." (parenthetical statement added). *See C.H. Guenther & Son, Inc. v. NLRB*, 427 F.2d 983 (5th Cir.), *cert. denied*, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970) (enforcing a Board order based upon § 159(c)(3) as quoted above.)

These statutory provisions make effective the right to strike as a core principle in

---

1. As pointed out in later discussion, the other factors cited by the Company would not, by themselves, justify the withdrawl of union recognition. In particular, the refusal of five workers to join the strike and the statements of discontent by seven employees are not sufficient evidence to support a good faith doubt as to the Union's continued majority status, even where the workers purport to speak for other employees.

a free economic society. The guarantee is contained in 29 U.S.C. § 163. Then the statutory provisions go on to recognize the usual pragmatic resolution of an economic strike where replacements have been hired. The settlement of an active economic strike almost always requires reinstatement of the strikers with full seniority rights. The replacements often are retained also but at junior seniority. Attrition is counted upon gradually to reduce the work force to a realistic complement. Note that the statute sets twelve months as the realistic time of the outside limit upon whether a strike is active. In the case before us a mere month was the strike duration.

These facts and the statutory provisions lay the foundation for the consideration of the legal issue of importance in this case: Does the company have the right, under the law, to assume that the strike replacements are anti-union? The Board refuses to presume that the replacement workers are for or against the union, following its new policy set out in *Station KKHI (Buckley Broadcasting of California Corp., Inc.)*, 284 N.L.R.B. No. 113, 125 L.R.R.M. (BNA) 1281 (1987), application for enforcement pending, 9th Cir. No. 88–7106. Under this approach, a company which wishes to withdraw union recognition has the burden of providing objective evidence of a lack of union support, without the aid or detriment of any presumptions regarding replacement workers.

In *Station KKHI*, the Board reconsidered and rejected its prior position that replacement workers supported the incumbent union in the same ratio as the employees they replaced. Responding to criticism by the Courts of Appeals that this presumption was counterintuitive and created an unrealistic hurdle for employers to overcome, the Board concluded that "[a]s a matter of policy, there is no warrant for a presumption of strike replacement support for an incumbent union." 125 L.R.R.M. at 1283.

The Board in *Station KKHI*, however, also declined to adopt the opposite, negative presumption that replacement workers *do not* support the union. The Board rec-

ognized that the failure of replacement workers to withhold working as a means of supporting an economic strike is not necessarily an indication of dissatisfaction with the union. In particular, "an employee may be forced to work for financial reasons, or may disapprove of the strike in question but still desire union representation and would support other union initiatives." 125 L.R.R.M. at 1286. *See also NLRB v. Pennco, Inc.*, 684 F.2d 340, 342 (6th Cir.), *cert. denied*, 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982); *NLRB v. Windham Community Memorial Hospital*, 577 F.2d 805, 813 (2nd Cir.1978).

The Board also identified significant policy concerns which led it to reject the negative presumption that replacement workers do not support the union. The ultimate impact of the negative presumption, and the unfortunate result of the majority opinion, is to allow an employer to withdraw union recognition in the economic strike context whenever he hires more replacement workers than the number of employees on strike. The Board determined that this policy "would disrupt the balance of competing economic weapons long established in strike situations and substantially impair the employees' right to strike by adding to the risk of replacement the risk of loss of the bargaining representative." 125 L.R.R.M. at 1286.

Thus, in *Station KKHI* the Board decided to reject both the positive and negative presumptions regarding union support among replacement workers. The Board concluded that

> we can discern no overriding generalization about the views held by strike replacements and therefore we decline to maintain or create any presumptions regarding their union sentiments. Rather, we will review the facts of each case, but will require 'some further evidence of union non-support' before concluding that an employer's claim of good-faith doubt of the union's majority is sufficient to rebut the overall presumption of continuing majority status.

*Id.*, citing *NLRB v. Pennco*, 684 F.2d at 343.

The Board's analysis in *Station KKHI* is compelling under the provisions of the basic statute. Some courts agree with the Board's position and have refused to attach presumptive significance to the hiring of replacement workers. *NLRB v. Windham Hospital*, 577 F.2d at 813–14. *NLRB v. Pennco*, 684 F.2d at 342. This *ad hoc* approach allows the Board to take into account the particular circumstances surrounding each strike and the hiring of replacements, while retaining the long-standing requirement that the employer must come forth with some objective evidence to substantiate his doubt of continuing majority status. *See NLRB v. Gulfmont Hotel Co.*, 362 F.2d 588, 592 (5th Cir.1966); *J. Ray McDermott & Co., Inc. v. NLRB*, 571 F.2d 850, 858–59 (5th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978). Moreover, the refusal to apply presumptions of union support or non-support to replacement workers is consistent with the Board's position regarding workers employed when a strike begins who also cross the picket line.[2]

The question before us, however, is not the subjective question the majority implicitly asks, whether the Board's policy is "correct." The refusal to attach any presumptive weight to the hiring of replacement workers is, at the very least, a reasonable policy choice which is not inconsistent with the National Labor Relations Act. As such, even if this Court prefers a different approach the only proper course is to enforce the Board's view because of the deference we are required to afford the Board's policy decisions.

The majority has nonetheless determined that we should reject the Board's policy as set out in *Station KKHI*. First, they contend that the Board did not really adopt a new standard in *Station KKHI*, but instead returned to the presumption that permanent replacements support the union in the

same ratio as the workers they replaced, a position this Court rejected in *NLRB v. Randle–Eastern Ambulance Service, Inc.*, 584 F.2d 720 (5th Cir.1978). They conclude that "operationally the *Station KKHI* standard has the same effect as the presumption that striker replacements support the union ... [because] the general presumption of continuing union majority still applies."

It is true, as the majority notes, that under both the Board's prior presumption of union support among replacement workers and its current neutral position announced in *Station KKHI*, an employer must come forward with some objective evidence regarding the replacement workers' failure to support the union. This does not mean, however, that the two standards are the same. What is different is the nature and amount of evidence required. The *Station KKHI* standard follows the general requirement that an employer must provide evidence of the lack of union support to substantiate his doubt of the union's majority status, and simply applies this long-standing rule in the context of an economic strike situation where replacements have been hired. In contrast, the Board's prior rule required more—in the face of a presumption that the replacement workers *did* support the union, the employer had to submit evidence of sufficient quantity and quality to prove that such support did not in fact exist. Stated more pragmatically, the new Board policy gives more flexibility to consider each situation on its own facts.

The majority also suggests that the Board's refusal to attach any presumptive significance to the hiring of replacement workers conflicts with the holding of this Court in *NLRB v. Randle–Eastern, supra*. In *Randle–Eastern*, we rejected the Board's positive presumption that replace-

---

**2.** The Board does not presume that the failure of original employees to join a strike indicates their lack of support for the union. *Windham Community Memorial Hospital*, 230 N.L.R.B. 1070 (1977), *enforced* 577 F.2d 805, 813–14 (2nd Cir.1978); *Skydyne Division of Brooks & Perkins, Inc.*, 282 N.L.R.B. No. 143, 124 L.R.R.M. (BNA) 1358 (1987); *Ashe Brick Co.*, 280 N.L.R.B. No.

162, 123 L.R.R.M. (BNA) 1023 (1986). It seems incongruous that the majority apparently accepts this proposition, which was applied by the Board in the present case, and at the same time concludes that when it is *replacement workers* who cross the picket line it should be presumed that they do not support the union.

ment workers support the union in the same ratio as the employees they have replaced. The majority contends that we also held that the opposite, negative presumption that replacement workers do not support the union must apply.

While several courts did reject the Board's prior position that replacement workers do support the union in the same proportion of the employees, there is a conflict among the circuits regarding the appropriate substitute for that policy.[3] Some courts approve the *Station KKHI* approach and permit the Board to refuse to presume that replacement workers are for or against the union. *NLRB v. Windham Hospital*, 577 F.2d at 813–14; *NLRB v. Pennco*, 684 F.2d at 342. Other circuits have specifically adopted the requirement of a negative presumption, also known as the Gorman presumption,[4] that replacement workers do not support the union. *Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1109–10 (1st Cir.1981); *National Car Rental System, Inc. v. NLRB*, 594 F.2d 1203 (8th Cir.1979).

Our opinion in *Randle–Eastern* does not place this Circuit within that latter category. The holding of *Randle–Eastern* is that the presumption that new workers support the union in the same ratio as the employees they have replaced "does not apply where the 'turnover' results from the replacement of strikers." 584 F.2d at 728. The rejection of this positive presumption, however, does not constitute the creation of the opposite, negative presumption that these workers do not support the union. *See Pennco*, 684 F.2d at 342; *Windham Hospital*, 577 F.2d at 813–14. While the *Randle–Eastern* decision did cite to Professor Gorman's treatise, the Gorman presumption was not made part of the court's holding.[5]

Even more significant and fully persuasive is the circumstance that *Randle–Eastern* is factually distinguishable from the present case. The *Randle–Eastern* court emphasized that the picket line violence and the union's insistence that the replacement workers would have to be discharged were factors which gave credence to the employer's belief that the replacement workers did not support the union. 584 F.2d at 723. It is highly unlikely that a

**3.** *See Pennco, Inc. v. NLRB*, 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982) (denial of writ of certiorari to petitioner Pennco in *NLRB v. Pennco*, 684 F.2d 340 (6th Cir.1982), a case upholding a no presumption rule.) Justice White, joined by Justices Blackmun and Rehnquist, dissented from the denial of certiorari, noting that "[t]he questions of whether presumptions can properly be used to determine whether a union has the support of striker replacements, and whether replacements should be presumed to oppose the certified union or favor the certified union, have produced conflict among the courts of appeals and between the courts of appeals and the agency charged with enforcing the National Labor Relations Act." 459 U.S. at 996, 103 S.Ct. at 356.

**4.** R. Gorman, Labor Law 112 (1976): "If a new hire agrees to serve as a replacement for a striker (in union parlance, a strike breaker, or worse), it is generally assumed that he does not support the union and that it ought not to be counted toward a union majority."

The Justices dissenting from the denial of certiorari in the *Pennco* case recognized that those circuits which "appear to presume that striker replacements do not support the certified union ... seem to rely heavily on the statement made by one commentator, R. Gorman." The Justices then noted that Professor Gorman's

original statement was supported only by a single citation to *Titan Metal Manufacturing Co.,* 135 NLRB 196 (1962), "a case that has neither been cited by the NLRB for the proposition Gorman states nor been expressly overruled." 459 U.S. at 995, 103 S.Ct. at 355.

As an astute labor law scholar, I expect that Professor Gorman would be among the first to disavow that policy under the National Labor Relations Act is to be made by a single-author textbook or even by the courts rather than by the NLRB itself. Further, as a generalization, the Gorman statement does not take into account the fact that some strike replacements sorely need the wages regardless of union sympathy (they are not drawing strike benefits as striking employees may be). Still others may approve of the union because of its important grievance procedures for example, even though they feel the particular strike is ill-advised.

**5.** The *Randle–Eastern* court simply made reference to Professor Gorman's statement, but did not incorporate Gorman's position into the court's own pronouncement. 584 F.2d at 728. At its strongest, the court's reference to the Gorman presumption is equivocal. In the face of this ambiguity, *Randle–Eastern* is not properly construed as precluding the Board's *Station KKHI* policy.

replacement worker supports the Union if it is demanding that he be discharged and also is acting toward him with violence. These circumstances are totally absent in the case now before us. They militate against reading *Randle–Eastern* as establishing a general rule applicable in every strike situation where replacement workers are hired.[6]

Thus, *Randle–Eastern* is read much too broadly by the majority of the panel. Moreover, the Board's *Station KKHI* policy is not, as the majority contends, a mere restatement of the approach rejected in *Randle–Eastern*. Accordingly, I conclude we are bound to accept the Board's *Station KKHI* approach as a reasonable implementation of the policy of the law.

### III. *The Board's Decision*

The preceding conclusion on the legal issue leads to the remaining issue of whether the NLRB's factual conclusions are supported by substantial evidence on the record considered as a whole. The Board concluded that the evidence of a lack of Union support offered by the Company was insufficient to rebut the well-established and unchallenged presumption of continuing majority status, and thus the Company's withdrawal of recognition violated § 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5). In addition to the hiring of replacement workers, which the Board has determined is not a basis for presuming anti-union sentiment, the Company primarily relied on statements of dissatisfaction with the Union made by seven employees, one of whom was a replacement employee. The Company also argues that the fact that five employees failed to join the strike and

the Union's inactivity indicated that the Union had lost its majority status. But consideration of the entire record shows that there is more than sufficient evidence to support the Board's determination that the Company did not meet its burden of establishing a reasonably grounded good faith doubt of the Union's continued majority status. This Court should act in accordance with our assigned role, therefore, by enforcing the Board's decision.

First, as the Board has long held, the fact that five out of twenty-seven original employees failed to join the strike is not persuasive evidence that these employees do not support the Union. *See supra* note 2. Moreover, the Board correctly refused to attach any significance to the fact that the Union was not in contact with the Company for a little more than a month after the strike began.[7] While it is true that an employer may be justified in withdrawing union recognition after a sustained period of union inactivity, it is well within the course of bargaining for a union to fail to put forth a new or compromise proposal for several months. The Union's decision not to contact the Company for approximately five weeks in no way provides evidence of a lack of majority support for the Union. *Windham Hospital*, 577 F.2d at 814 ("the failure of the union to communicate with the [employer] during most of the summer months also does not provide grounds for doubt" of the union's majority status.)

It is clear that, absent any negative presumptions regarding replacement workers, the Company must rely on expressions of dissatisfaction with the Union made by seven employees to establish its good faith doubt of the Union's majority status.

---

**6.** The *Randle–Eastern* decision is analogous to *Whisper Soft Mills, Inc. v. NLRB*, 754 F.2d 1381 (9th Cir.1984). While the Company would have us believe that the Ninth Circuit unambiguously adopted the Gorman presumption in *Whisper Soft Mills*, a reading of the case shows that this is not so. Instead, the court concluded that the Administrative Law Judge was correct in determining that the replacement workers did not support the union under the "unique circumstances" of the case: the union was demanding discharge of a majority of the replacement workers. 754 F.2d at 1388.

**7.** The Company argues that the Union's "inactivity" also serves as evidence of its good faith doubt of the union's majority status. This assertion is unrealistic in the real world of lawful strike activity. The Union was conducting a strike during nearly all of the period in question. The Company is referring to the fact that the Union did not immediately respond to every Company offer, and failed to contact the Company from June 12 to July 16, 1979.

There is nothing in the record which should lead this Court to disturb the Board's conclusion that these statements are not sufficient evidence of a lack of majority support to justify a withdrawal of union recognition.

The Company makes much of the fact that a few employees who voiced complaints purported to speak for others, and asserted that other workers were dissatisfied with the Union. The Board has properly determined, however, that as a general rule such imputed representations of the opinions of others do not carry great weight. Otherwise, "a few anti-union employees could provide the basis for a withdrawal of recognition when in fact there is actually an insufficient basis for doubting the union's continued majority." *Golden State Habilitation Convalescent Center,* 224 N.L.R.B. 1618, 1619–20, enforcement denied on other grounds *sub nom. Dalewood Rehabilitation Hospital, Inc. v. NLRB,* 566 F.2d 77 (9th Cir.1977). There is no reason to disturb the Board's conclusion as to this contention.

The majority argues that the Company was justified in attaching "significant weight" to the comments of Chief Shop Steward Shady Goodson, who stated that he was having difficulty manning the strike and that only the Union, and not the employees, wanted the strike. Mr. Goodson expressly stated, however, that he was not speaking as a representative of the employees or the Union. The Board was entitled to accept his disclaimer and give weight to his comments accordingly. It is for the Board to weigh evidence and pass on credibility, not for us. Moreover, Mr. Goodson's comments simply do not rise to the level of official union acknowledgement of a lack of union support which was exhibited in those opinions upon which the majority relies. *See e.g., Lodges 1746 and*

*743, Int'l Association of Machinists v. NLRB,* 135 U.S.App.D.C. 53, 57–58, 416 F.2d 809, 812–13 (1969), *cert. denied,* 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752 (1970) (written memorandum by union's attorney flatly stating that the union did not enjoy a majority support); *Randle–Eastern,* 584 F.2d at 728 (company had been informed by a union representative that "50 to 25 or 20%" of the strikers would not be returning to work).

Finally, I note some parts of the record which the majority of the panel overlooks but which further support the Board's decision. First, several of the statements which the Company relies upon, including the statements of Mr. Goodson and the complaints regarding strike pay made by Mr. Blackshire, can legitimately be construed as objections to the strike itself or the way it is being conducted. Such statements do not necessarily constitute a rejection of the Union as a bargaining representative. *Windham Hospital,* 577 F.2d at 814. Moreover, while the Company and the majority both note that one replacement worker, Mr. Schneider, volunteered the opinion that the Union did not represent the employees and was not needed, they fail to point out that fourteen other replacement employees were interviewed in the same manner as Mr. Schneider, and none of them volunteered any animus toward or opposition to the Union.[8] The majority of the panel clearly intruded into the role of the Board when it gave substantial weight to the anti-union statements of this one replacement worker while ignoring the fact that fourteen other replacement workers were given exactly the same opportunity to speak and did not feel any stimulus to offer any thoughts pro or con as to the Union.

---

8. Ms. Price, the director of employee relations who provided the Company with its information regarding Union support, conducted interviews of fifteen of the replacement workers on July 18–19, 1979 to see how they were coming along with their new jobs. She did not solicit comments regarding the Union.

Of the fifteen workers interviewed, only two mentioned the Union. One stated that "the Un-

ion thing did not enter his mind." The other, Mr. Schneider, voiced his assessment that the Union was not needed "as long as the Company treats him good." The failure of most replacement employees to state an opinion either way lends credence to the Board's position that these workers should not be presumed to be for or against the Union.

The bottom line is that the seven employees who voiced complaints about the Union were members of a bargaining unit of fifty. The Board could reasonably conclude that their dissatisfaction was not sufficient evidence to justify a conclusion that the Union has lost *majority* support. The majority of the panel does not afford the statutorily mandated power to the Board to decide this case as an adjudication based upon all the evidence. I cannot agree to usurping the Board's proper role in this manner. The majority makes of itself a super labor board rather than a reviewing court of appeals. I would therefore enforce the Board's order that the Company must recognize and bargain with the Union. I dissent.