**BICKERSTAFF CLAY PRODUCTS COMPANY, INC., Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

No. 87–7609.

United States Court of Appeals, Eleventh Circuit.

April 27, 1989.

Richard Y. Bradley, James E. Humes, II, Hatcher, Stubbs, Land, Hollis & Rothschild, Columbus, Ga., for petitioner, cross-respondent.

Aileen Armstrong, Deputy Associate to Director, John Burgoyne, Director, Peter D. Winkler, Charles P. Donnelly, Jr., Washington, D.C., for respondent, cross-petitioner.

Before RONEY, Chief Judge, COX, Circuit Judge, and MORGAN, Senior Circuit Judge.

MORGAN, Senior Circuit Judge:

This case is before the court on the petition of Bickerstaff Clay Products Company, Inc. ("Bickerstaff" or "the Company") for review of an order by the National Labor Relations Board ("NLRB" or "the Board") on September 30, 1987, and the Board's cross-application for enforcement. The Board found that Bickerstaff violated

Sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. Sec. 158(a)(1) and (5), by withdrawing recognition of Laborers' Local Union No. 246 ("the Union") as the representative of the Company's employees, by failing and refusing to furnish the Union with certain information requested, and by failing and refusing to execute a collective-bargaining agreement found to have been reached on April 8, 1986.[1]

The Board's order requires the Company to cease and desist from these unfair labor practices. As affirmative relief, the order requires the Company to recognize and bargain with the Union, and to furnish the Union with the information it sought concerning the bargaining unit. Additionally, the Board ordered the Company, upon request, to sign a collective-bargaining agreement containing the terms and conditions of employment agreed to between the Company and the Union, and to give retroactive effect to its terms and conditions; or, if no such request is made by the Union, to bargain for a new collective-bargaining agreement and sign any agreement reached. Finally, the order requires the Company to post copies of a remedial notice to employees. We decline to enforce the Board's order.

## BACKGROUND

Bickerstaff makes and sells brick and tile products. The Company currently operates four manufacturing plants in Russell County, Alabama.

The history of labor relations between Bickerstaff and the Union began in 1965 when the Union petitioned for recognition as the bargaining representative at three of the Company's manufacturing plants.

Separate elections were held at each manufacturing plant. Although the Union won only one election, the present management of Bickerstaff voluntarily recognized the Union as the bargaining representative of the employees in all of the Bickerstaff plants in Russell County, Alabama. Since 1966, the Union and Bickerstaff have successfully negotiated successive labor agreements without a work stoppage until November 11, 1985. The last bargaining agreement between Bickerstaff and the Union which by its terms was to expire on October 31, 1985, was extended by mutual agreement until November 10, 1985. The parties were unable to consummate an agreement, however, and the Union called a strike which began on November 11, 1985.

In September 1985, negotiations commenced to replace the parties' collective-bargaining agreement expiring on October 31, 1985. From September 17, 1985 to the first week of November, Bickerstaff and the Union held ten bargaining sessions prior to the strike. Negotiations were not productive, and on November 6, the Company made a final offer of contract terms.[2] The membership of the Union rejected the offer on November 10, and voted to go on strike the next day at the Company's four brick production facilities. Out of a total collective-bargaining unit of 304 employees, 195 participated in the strike and another 109 did not strike. Beginning on November 11, the Union picketed the Company's Phenix City office and plants.

There were four meetings between union and company representatives after the strike commenced on November 11, 1985. On November 18, union and company negotiators met with a federal mediator, but no

---

1. The Board's order is reported at 286 NLRB No. 27 (1987).

2. Appellant's chief operating officer, President Herbert Fuller, testified that in negotiations before November 6, 1985, the Company and the Union "had been unable to reach an agreement on only a few minor points such as probationary period, bulletin board use, call in pay ... [but] we were still drastically apart on the economic issues," such as wage increases, increased pensions and insurance contributions and holi-

days. For instance, Bickerstaff's final offer included an across-the-board hourly wage increase of twenty cents per year for the three-year contract. The Union's final position was an hourly wage increase of forty-five cents per year for the same time period. As found by the Board, Bickerstaff's November 6 final offer covered all of the outstanding issues mentioned by Fuller and, in combination with the other issues previously agreed to by the Company and the Union, constituted a complete contract.

progress was made toward agreement on a new contract. The parties met again on December 9, 1985, but to no avail. A private meeting was held on December 12, 1985 between the Company's Chief Executive Officer, Richard Bickerstaff, and a representative of the International Union. The Union and the Company had a final unsuccessful negotiation session on January 13, 1986.

On January 23, 1986, the Company advised the Union that negotiations were at an impasse and that the Company was instituting "wages and other benefits for those working in the plants in accordance with the Company's final proposal which was made on November 6, 1985."[3] The Union did not respond and the Company heard nothing from the Union until April 8, 1986. By letter dated April 8, 1986, the Union informed the Company that it "accepted the final offer made by the Company on November 6, 1985," and offered unconditionally to have the striking employees return to work. In that letter, the Union asked for a listing of all employees currently working along with various matters regarding each working employee.[4] Then, on April 9, 1986, the Company wrote the Union:

> This will acknowledge receipt of your letter of April 8, 1986 regarding your union and Bickerstaff Clay Products Company, Inc.

Based upon facts and circumstances which have occurred since the strike at our client's plant, we seriously doubt that your union represents a majority of our employees. Under these circumstances we do not believe that we can recognize your union as the bargaining agent for our employees. Therefore, our last offer is no longer outstanding to your union and your offer to sign a collective bargaining agreement with our client is declined. Furthermore, your request for information about our employees is refused.

Thereafter, the Company refused to bargain with the Union.

The Union filed an unfair labor practices charge with the Board on April 11, 1986, alleging violations of Sections 8(a)(1) and (5) of the NLRA, 29 U.S.C. Sec. 158(a)(1) and (5). The Board issued a complaint against the Company on May 16, 1986. Bickerstaff's answer denied any violations of the Act claiming that on the critical date (1) the Union was not representative of a majority of bargaining unit and (2) the Company entertained a reasonable good faith doubt of the Union's majority status. Administrative Law Judge Pargen Robertson ("the ALJ") heard the case on July 16, 1986. In his December 15, 1986 decision, the ALJ rejected the defenses of Bickerstaff and found the Company to be in violation of the Act.

3. The Company notified the Union by letter dated January 23, 1986, which stated in part:
> The Company is desirous of increasing wages and other benefits for those working in the plants in accordance with the Company's final proposal which was made on November 6, 1985.
> After due consideration, we have concluded that negotiations are and have been at an impasse and accordingly, the Company will put its final proposal into effect as of January 27, 1986.

Thereafter, the Company effectuated an hourly wage increase of twenty cents and other benefits as proposed in its final offer.

4. By April 8, 1986 letter, the Union wrote the Company as follows:
> This is to inform you that the Laborers' Local 246, affiliated with the Laborers' International Union of North America, AFL–CIO, has accepted the final offer made by the Company on November 6, 1985.

> It is my understanding that the Company has implemented the terms of that final proposal on January 27, 1986. We will be available to meet and sign the Agreement on Monday, April 21, 1986 if this meets with your schedule....
> Additionally, please forward to me a listing of all employees currently working at your Phenix City, Alabama operations. Along with their name, please include the following information: address, phone number, social security number, date of hire, job assignment, rate of pay, marital status, shift, and number of dependents.
> By this letter we are offering an unconditional return to work for all striking employees and request you provide me with a listing of all employees you place on the preferential hiring list.
> I look forward to seeing you on the 21st of this month.

Thereafter, Bickerstaff filed exceptions to the decision with the Board. The issue before the Board was whether there were sufficient objective indications to enable the Company to entertain a reasonable, good faith doubt that the Union represented the majority of its employees at the time the Company withdrew recognition. On September 30, 1987, the Board ruled that it did not and affirmed the ALJ's decision that Bickerstaff violated the Act by withdrawing recognition from the Union on April 9, 1986; by refusing to sign a collective-bargaining agreement with the Union; and by refusing to provide the Union with bargaining unit information. Bickerstaff filed a timely petition in this court to review and set aside the Board's decision. The Board then filed its cross appeal for enforcement. This court has jurisdiction pursuant to 29 U.S.C. Sec. 160(e) and (f).

## STANDARD OF REVIEW

▮ In reviewing an order issued by the NLRB, the courts must accept the Board's findings of fact, "if supported by substantial evidence on the record considered as a whole ..." 29 U.S.C. Sec. 160(e). This general standard of review, however, eludes precise definition. As interpreted by the Supreme Court in *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 477, 71 S.Ct. at 459. In searching "the whole record" for substantial evidence, a reviewing court "must take into account whatever in the record fairly detracts" from the Board's fact finding as well as evidence that supports it. *Id.* at 487–88, 71 S.Ct. at 464–65. *See Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1073 (1st Cir.1981). The court is not free to substitute its judgment for that of the Board simply because the court would have made a different choice had the matter been before it *de novo. Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. at 465. On the other hand, this court is not a "rubber stamp" or the enforcement arm of the NLRB, *Thomas In-*

*dus., Inc. v. NLRB*, 687 F.2d 863, 866 (6th Cir.1982), and we must set aside the Board's decision when the court "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera Corp.*, 340 U.S. at 488, 71 S.Ct. at 465.

## WITHDRAWAL OF RECOGNITION

The Board's decision that the Company violated Sections 8(a)(1) and (5) of the NLRA flowed from its conclusion that Bickerstaff unlawfully withdrew recognition from the Union. The issue before this court is whether substantial evidence exists on the record as a whole to support the Board's decision.

### A. The Legal Standards

▮ The broad contours of the law in this area are well settled. Generally, a union that has been certified in a Board-conducted election or voluntarily recognized by an employer is entitled to a continuing presumption of majority status. Absent special circumstances, this presumption is irrebuttable for a one-year period following formal certification or voluntary recognition. *See Ray Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). After the expiration of the certification year, the presumption of the Union's continuing majority support continues but becomes rebuttable. *J. Ray McDermott & Co. v. NLRB*, 571 F.2d 850, 859 (5th Cir.1966); *NLRB v. Gulfmont Hotel*, 362 F.2d 588, 589 (5th Cir.1966). The employer may rebut that presumption, so as to lawfully withdraw recognition of the Union, if it can demonstrate either (1) that the Union actually lost its majority support or (2) that the employer had a good faith doubt based on objective consideration of the continued existence of majority support for the Union. *NLRB v. A.W. Thompson, Inc.*, 449 F.2d 1333, 1336 (5th Cir.1971), *cert. denied*, 405 U.S. 1065, 92 S.Ct. 1497,

31 L.Ed.2d 795 (1972); *NLRB v. Pennco, Inc.*, 684 F.2d 340 (6th Cir.1982).

] A good faith doubt of the Union's majority status is a defense to a refusal-to-bargain charge based on the withdrawal of recognition. The employer's good faith doubt must be reasonably grounded and supported by objective considerations and "may not depend solely upon unfounded speculation or a subjective state of mind." *Gulfmont Hotel*, 362 F.2d at 589; *see Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1110 (1st Cir.1981). This is essentially an objective test, although "subjective evidence may be used to bolster the argument that such doubt existed at the relevant time."[5] *NLRB v. Windham Community Memorial Hospital*, 577 F.2d 805, 811 (2d Cir.1978) (quoting *Orion Corp. v. NLRB*, 515 F.2d 81, 85 (7th Cir.1975)). Under this standard, the employer need not conclusively demonstrate that a majority of its employees no longer desire to be represented by the Union. *NLRB v. Randle–Eastern Ambulance Service, Inc.*, 584 F.2d 720 (5th Cir.1978).

 Determining whether an employer entertains a good faith doubt of a union's majority status is a question of fact. *NLRB v. Imperial House Condominium, Inc.*, 831 F.2d 999, 1007 (11th Cir.1987). The burden of proof is on the employer to establish that it had a reasonable, bona fide belief that the Union no longer represented a majority of the bargaining unit employees. *See Allied Industrial Workers Local 289 v. NLRB*, 476 F.2d 868, 881 (D.C.Cir. 1973). Once sufficient evidence has been presented to raise a reasonable doubt as to the continued majority status, the rebuttable presumption is overcome and the burden shifts to the counsel for the Board "to prove that on the critical date, the Union in fact represented a majority of the employees." *Landmark Intern Trucks, Inc. v. NLRB*, 699 F.2d 815 (6th Cir.1983) (quoting *Lodge 1764 and 743, IAM v. NLRB*, 416 F.2d 809, 812 (D.C.Cir.1969)).

**B. Summary of Objective Evidence**

The Company asserts that its doubt was arrived at in good faith, based on the following factors: the hiring of permanent replacements; returning strikers crossing the picket line; violence and threats associated with the strike; resignations from the Union and withdrawals of dues deduction authorizations; breakdown in Union leadership; Union inactivity and lack of communication with the Company; employee dissatisfaction and disillusionment with the Union; and, finally, the composition of the bargaining unit on April 9, 1986. A summary of the Company's evidence supporting its good faith doubt as to the Union's majority status is outlined below.

(1) *Replacement of strikers.* Shortly after the strike was called on November 11, 1985, the Company began hiring replacement workers for the strikers. On November 12, the Company placed an advertisement in a local newspaper seeking new employees to replace those who had gone out on strike. Between November 13 and 15, the Company had hired 85 new employees as replacements for the strikers. During the first ten days of the strike, a total of approximately 150 new workers were hired. By the end of December 1983, Bickerstaff had hired 193 new employees and the Company was again fully staffed. According to the Company's records, a total of 227 replacements had been hired when Bickerstaff withdrew recognition. The record shows that 93 of these replacements were actually working at the close of business on April 4, 1986. Twice during negotiations following the strike, Bickerstaff refused to agree to discharge replacements as proposed by the mediator on behalf of the Union.

(2) *Returning strikers.* Out of approximately 300 bargaining unit employees, 195 initially participated in the strike. The Union representative conceded at the hearing that: "On or about December 12th or 13th, [1985], a majority of the striking employees abandoned the strike to return to work." By mid-January 1986, 101 strikers had

---

**5.** The relevant date to look to in determining the bona fides of the employer's doubts is the date that recognition is withdrawn. *Pennco, Inc.*, 684 F.2d at 342.

crossed the picket line and had returned to work. On the critical date the Company withdrew recognition of the Union, at least 147 former striking employees had abandoned the strike and returned to work. The record shows that 133 of the original strikers were employed by the Company at the close of business on April 4, 1986.

(3) *Violence and threats associated with the strike.* At the commencement of the strike, there were a number of incidents of violence associated with the strike. The record shows that these incidents included damage to property, ranging from a shotgun blast into the home of an employee to slashed tires, and personal threats against employees who crossed the picket line. As a result of these incidents of violence, Bickerstaff filed a complaint in state court on November 14, 1986 seeking injunctive relief against the Union and its officers to prevent recurrence of the threats and acts of violence. On November 15, the Circuit Court of Russell County, Alabama granted the injunction, restraining the Union and "its members, agents, [and] representatives" from committing acts of violence, threats, injuries, or damage to property. There were no incidents of violence reported after entry of the injunction on November 15.

(4) *Written resignations and dues check-off.* After the commencement of the strike, fifteen former union members tendered written resignations from the Union. The record shows that the Company received twenty-three withdrawals of dues deduction authorizations in addition to the written resignations. Therefore, a total of thirty-eight employees either resigned or withdrew from union dues deductions after the strike began on November 11, 1986.

(5) *Breakdown in union leadership.* Shortly after the strike started, the union experienced internal difficulties involving the resignation of its business manager. On December 12, 1985, Union Business Manager Tommy Williams officially resigned his position. After Mr. Williams' resignation, there was no effort to employ another business agent for Local 246 al-though a succession of four representatives of the International and the District Council of the Union attempted to function as business agent. On January 3, 1986, the International Union parent labor organization placed the Union under trusteeship and dismissed the Union's elected officials. On the following day, January 4, the District Council assumed control of the Union.

(6) *Union inactivity.* The last meeting between the Union and Bickerstaff occurred on January 13, 1986. On January 23, 1986, Bickerstaff declared an impasse and implemented its final offer. The Union did not respond and Bickerstaff received no further communication from the Union until the Union's letter of April 8, 1986, three months later, by which it offered to enter into a collective-bargaining agreement.

The Company submits that a diminishing number of pickets also indicated the lack of union activity and support for the strike. From a high of 39 pickets and picket lines at three separate locations during the week of November 24, 1985, the number of pickets diminished to 20 by the end of January and, finally, to 8 by mid-March. No pickets were seen by the Company after March 30, 1986.

Prior to the strike, the Company asserts that the Union had been active in pursuing grievances and arbitrations for Bickerstaff employees. After the strike, however, the Union never represented any of the members who filed grievances against the Company. A request for arbitration on a matter pending before the strike was never pursued by the Union. Prior to the Company's withdrawal of union recognition, there were four unfair labor practice charges filed against Bickerstaff.[6] The first three, which were filed during the month of November 1985, were filed by the Union itself. The fourth charge was filed on March 24, 1986; however, it was filed by an individual party without union support or participation.

(7) *Employee dissatisfaction and disillusionment with the Union.* On March 6, 1986, an unfair labor practice charge was

6. Two of these charges were dismissed by the Board and two were voluntarily withdrawn.

filed against the Union by three of Bicker-staff's employees. The charge alleged that the Union failed in its duty to fairly represent Bickerstaff's employees. A letter from the Regional Director of the Board on March 20, 1986, a copy of which was sent to Bickerstaff, set out the following investigative findings:

Although some of the members of the Local, including some of the Local Union officials, were dissatisfied with the representation provided them by the International Union after the resignation of the business manager, there was no evidence which would establish that the International Union's conduct was based on any arbitrary or discriminatory considerations. In addition, even though some of the members of the Local have alleged that representatives of the International Union and the business manager of the Local promised to pay benefits to employees participating in the strike against Bickerstaff Clay Products, the Union's refusal to pay those benefits would not constitute an unfair labor practice.[7]

The Company asserts that the Board's own investigation into the unfair labor charge filed by three of the Union's members verified two factors which were significant in Bickerstaff's decision to withdraw recognition: (1) that members of the Local were dissatisfied with leadership provided by the Union; and (2) that the Union reneged upon promised strike benefits.

(8) *Composition of bargaining unit on April 9, 1986.* When the Company withdrew recognition on April 9, the record shows that 304 employees were working in the bargaining unit. The ALJ noted that by the critical date, at least 147 former strikers had returned to work and a total of

227 replacements had been hired. The ALJ stated that the record did not show what portion of the 304 employees working on April 9, 1986 was made up of replacements, returning strikers, or employees that did not engage in the strike. However, the Board found that the record shows that on April 4, 1986 there were 304 employees at work, of whom 93 had been hired to replace strikers; 133 were strikers who had crossed the picket lines and returned to work; and 78 were employees who had not struck.

## C. Discussion

The decision of *NLRB v. Randle-Eastern Ambulance Service, Inc.,* 584 F.2d 720 (5th Cir.1978), controlling in this circuit,[8] establishes the standards by which the lawfulness of Bickerstaff's withdrawal of recognition of the Union is to be measured. As in the instant case, the Board decided in *Randle-Eastern* that the employer did not prove it had the required objective evidence to support a reasonable doubt as to the Union's majority status. The Court of Appeals disagreed and reversed the Board's decision. In *Randle-Eastern,* the Fifth Circuit found that three main factors existed which, considered collectively, afforded the Company with an objective basis to doubt the Union's majority status:

First, 46 [of 166] of the original strikers had returned to work ... In discounting the value of this evidence, the Board relied on the principle that an employee's return to work during a strike does not by itself provide a reasonable basis for presuming he has repudiated the Union as his bargaining representative. [Citations omitted]. But other

7. During the strike, the local newspapers carried stories about a strike fund that had been promised to be activated for the benefit of the strikers. However, strikers who returned to work for Bickerstaff expressed disillusionment and dissatisfaction with the Union because such promises never materialized. The Union representative who testified at the hearing acknowledged that he heard certain of the strikers make the following statement which was reported in a local newspaper story concerning the strike:

Strikers who filed the NLRB charge against the Union said that they are still angry the

Union reneged on a promise to set up a strike fund for Local 246. They predict that if Laborers International tries to maintain Local 246, it will find the biggest brick wall at Bickerstaff is between the Union and its estranged members.

8. The decisions of the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981 are binding as precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206 (11th Cir.1981).

factors present here gave the Company a reasonable basis for believing that a good number of the returning strikers no longer supported the Union. The Company had received copies of Union resignation letters from 19 returning strikers and had received information that other reinstatements had also resigned from the Union. Although nonmembership alone does not necessarily indicate nonsupport [citation omitted], resignation after crossing the picket line in a fairly acrimonious strike does.

Second, the Company had hired 47 permanent replacements, of whom six had indicated disinterest in the Union or had been the victims of picket line violence. In the proceedings below, the Board rejected this as evidence of loss of Union support in the workforce, relying on the presumption that new employees "support the Union in the same ratio as those they have replaced." This presumption is usually applied when the employer has experienced high turnover and is trying to escape his bargaining obligations by citing that turnover as his "objective evidence." [Citation omitted]. In our view, however, the presumption does not apply where the "turnover" results from replacement of strikers. *See* R. Gorman, Labor Law 112 (1976): "[I]f a new hire agrees to serve as a replacement for a striker (in union parlance, a strike breaker, or worse), it is generally assumed that he does not support the Union and that he ought not be counted toward a Union majority." This is especially true where, as here, the Union is asserting at the bargaining table that the replacements will have to be discharged in order to make room for returning strikers. [Citation omitted].

Third, the Company had been informed by a Union representative that "50 to 25 or 20%" of the strikers would not be returning to work. *Id.* at 728.

 It is true that an employee's return to work during a strike does not by itself provide a reasonable basis for presuming that he has repudiated the Union as a bargaining representative. *Allied Indus. Workers, Local Union No. 289 v. NLRB*, 476 F.2d 868, 881 (D.C.Cir.1973). Absent supporting evidence, it may mean no more than that an employee was forced to work for economic reasons, or that he did not approve of the strike in question but still desires union representation. *Id.; see, e.g., NLRB v. Frick Co.*, 423 F.2d 1327 (3d Cir.1970). But other factors, such as employee resignations and dues deduction withdrawals, may be considered by the Company in determining whether there is an objective basis for believing that a substantial number of returning strikers no longer desired union representation.[9]

In this case, the ALJ and the Board, by adopting his decision, stated that the "38 dues deduction withdrawals do not evidence withdrawal of support and the 15 resignations do not constitute a substantial withdrawal." We note, however, that the Company's evidence surpasses the evidence presented by the employer in *Randle–Eastern*. In that case, the court accepted as evidence indicating the loss of union support the fact that eleven percent (11%) of the employees resigned from the Union after the strike. Here, the Company presented evidence that 38 employees, or thirteen percent (13%) of the bargaining unit, either withdrew from dues check-offs or resigned from the Union.[10]

---

9. The decline in the number of employees participating in a check-off program is recognized as an objective factor upon which a good faith doubt can be based. *Ingress–Plastene, Inc. v. NLRB*, 430 F.2d 542, 546–47 (7th Cir.1970); *Thomas Indus. Inc., v. NLRB*, 687 F.2d 863 (6th Cir.1982). "A rapid or a large decline in the number of check-offs may be indicative of loss of support." *Thomas*, 687 F.2d at 868. In *Thomas*, the key factor was "not the percentage of employees on check-offs but rather the rapid decline in check-offs." *Id.* The "rapid" period in *Thomas* was ten months, whereas the Union received all of its withdrawals in this case within a four-month period.

10. We note that because Bickerstaff did not deduct union dues after the expiration of the contract and the commencement of the strike, the Company employees did not have an incentive to withdraw from dues check-off.

■] As the court in *Randle–Eastern* recognized, "[a]lthough nonmembership alone does not necessarily indicate non-support [citation omitted], resignation after crossing the picket line in a fairly acrimonious strike does." *Id.*, 584 F.2d at 728. In *Randle–Eastern*, there was no description of any specific violence. No returning strikers encountered violence and only a few replacements did. In this case, the ALJ rejected Bickerstaff's evidence because it claims "there was no showing that a substantial number" of those working on the critical date encountered threats or violence.

By adopting the ALJ's findings and conclusions, the Board's position seems to be that the Company could not base its doubt on this set of circumstances because Bickerstaff was able to suppress actual picket line violence with a state court injunction and because Bickerstaff did not specifically identify its workforce members on April 9, 1986 who had been subject to the violence. It should be emphasized, however, that there is no requirement that returning strikers or replacements have crossed the picket line in the face of violence. *See, e.g., Randle–Eastern*, 584 F.2d 720; *National Car Rental System, Inc. v. NLRB*, 594 F.2d 1203 (8th Cir.1979). Regardless, we note that the record is replete with numerous incidents of violence during the first week of the strike. Once a pervasive atmosphere of violence is established in a strike situation, that atmosphere does not vanish as soon as the violence ceases. We conclude that the substantial number of resignations and dues check-off authorizations in the circumstances of this case may be properly taken into consideration when assessing union majority, although that fact, if standing alone, could not justify withdrawal of recognition.

■ Although mere high employee turnover is not normally a sufficient ground to negate a union's presumed majority status, the permanent replacement of striking employees presents a different situation. *Soule Glass*, 652 F.2d at 1110. Until recently, the Board consistently relied on the presumption that striker replacements support the union in the same ratio as the striking employees whom they replace. *See, e.g., Cutten Supermarkets*, 220 NLRB No. 507 (1975); *Pennco, Inc.*, 250 NLRB 716 (1980). The Board's position, however, has been strongly criticized as unrealistic and uniformly rejected by reviewing courts of appeals. The Eighth Circuit's rejection of the presumption of strike replacement support for the Union in *National Car Rental System v. NLRB*, 594 F.2d 1203 (8th Cir.1979), was couched in particularly strong terms:

> If this presumption were to be employed here, we would reach the ridiculous result of presuming that all of the ... new employees favored representation by the union even though they had crossed the union's picket lines to apply for work and to report to work each day after they were hired. This presumption of the Board is not specifically authorized by statute and is so far from reality in this particular case that it does not deserve further comment.

*Id.* at 1206. Most recently, the Ninth Circuit noted that the presumption has never been embraced by any court, and affirmed an administrative law judge's conclusion that under the facts of that case, where the union demanded that the employer reinstate all of the strikers as a condition of any collective-bargaining agreement, it was unrealistic to presume that the strike replacements supported the Union. *Whisper–Soft Mills v. NLRB*, 754 F.2d 1381, 1387–88 (9th Cir.1984).

These two circuits, as well as the First and Fifth Circuits, appear to presume that striker replacements do not support the certified union, and refuse to enforce NLRB decisions grounded on the Board's contrary assumptions. *See Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055 (1st Cir.1981); *Randle–Eastern Ambulance Service, Inc.*, 584 F.2d 720 (5th Cir.1978); *see also Curtin Matheson Scientific, Inc. v. NLRB*, 859 F.2d 362 (5th Cir.1988). These circuits seem to rely heavily on the statement made by one commentator, R. Gorman, Labor Law (1970), that "if a new hire agrees to serve as a replacement for a striker (in union parlance, a strike breaker,

or worse), it is generally assumed that he does not support the Union and that he ought not be counted toward a Union majority." *Id.* at 112.[11]

In *Randle–Eastern*, our predecessor circuit considered the presumption that new employees support the Union in the same ratio as those they have replaced, and rejected its application where the employee "turnover" results from the replacement of strikers. *Id.*, 584 F.2d at 728. In rejecting the Board's presumption, the court approvingly cited Gorman's view that striker replacements be deemed not to support the union. Recently, in *Curtin Matheson Scientific, Inc. v. NLRB*, 859 F.2d 362 (5th Cir.1988), the Fifth Circuit reaffirmed that *Randle–Eastern* establishes the framework for evaluating a company's withdrawal of recognition of a union. In *Curtin Matheson*, the court reversed the Board's finding that the Company violated the NLRA by withdrawing recognition of the Union. In its decision, the court expressly reaffirmed the Gorman presumption, stating that it was "especially true" where the striker replacements were the victims of picket line violence, and the Union was bargaining for the discharge of the striker replacements to make room for returning strikers.[12] *Id.* at 367 (citing *Randle–Eastern,* 584 F.2d at 728).

On the other hand, the Second and Sixth Circuits refused to countenance any presumption concerning striker replacements. In *NLRB v. Windham Community Memorial Hospital,* 577 F.2d 805, 812–13 (2d Cir.1978), the court avoided the question of the validity of the Board's approach but rejected the presumption that "no replacement employee supports the Union," describing it as "equally, if not more assailable than the NLRB's [presumption]." *Id.* at 813. The Sixth Circuit likewise "expressly decline[d] to adopt either presumption" in *NLRB v. Pennco, Inc.*, 684 F.2d 340, 342–43 (6th Cir.), *cert. denied,* 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982). The Court held the employer's withdrawal of recognition unlawful because the employer simply did not establish any objective basis, aside from an invalid presumption, for believing that the certified union was not the choice of the majority. The court found that given the facts of the case, the evidence was sufficient "only to put the parties in equipoise." 689 F.2d at 393. The court concluded that the employer "would need some further evidence of union non-support in order to shift the burden to the Board to prove the union in fact had a majority status on the critical day." *Id.*

Recently, in *Buckley Broadcasting of Calif., Inc. d/b/a Station KKHI*, 284 NLRB No. 113 (1987) (*"Station KKHI"*), the Board addressed the recurring question in withdrawal of recognition cases of whether presumptively to count striker replacements for or against the Union. In *Station KKHI*, the Board departed from its earlier embrace of a presumption that striker replacements support an incumbent union. The Board acknowledged that "there was no articulated basis in reason or policy" for a presumption that strike replacements support the union in the same ratio as the striking employees they re-

---

**11.** *See Pennco, Inc. v. NLRB*, 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982) (denial of writ of employer's petition for certiorari in *Pennco v. NLRB*, 684 F.2d 340 (6th Cir.1982)). Justice White, joined by Justices Blackmun and Rehnquist, expressed the opinion that the Court should grant certiorari to address the conflict between the Board and the apparent acceptance of the Gorman presumption by four circuits. Justice White noted that Professor Gorman's original statement was supported only by a single citation to *Titan Metal Manufacturing, Co.*, 135 NLRB 196 (1962), a case that has neither been cited by the Board for the proposition Gorman states nor been expressly overruled. 459 U.S. at 995, 103 S.Ct. at 355.

**12.** In *Curtin Matheson*, the record contained no evidence of picket line or other strike-related violence or threats during the course of the strike. Although there was no picket line violence or negotiating to discharge the striker replacements, the court held that the Company was justified in doubting that the striker replacements supported the Union where a substantial majority of the bargaining unit employees are replaced in a very short period, and where the striker replacements cross a picket line, violent or not, to report to work each day. *Id.* (citing *National Car Rental System, Inc. v. NLRB,* 594 F.2d 1203 (8th Cir.1979)).

place, but also declined to adopt a countervailing presumption that replacements oppose the Union. The Board concluded that too many variables are present in a strike situation to confidently advance any generalization about the motives of strike replacements. Instead, the Board adopted a neutral, fact dependent approach derived from the Sixth Circuit in *Pennco, Inc.* The Board's ad hoc approach, then, is to consider the union sentiments of striker replacements on an all-of-the-circumstances basis, requiring "some further evidence of union non-support" of the employees who are hired as replacements for strikers in order to establish a good faith doubt. *Station KKHI,* 284 NLRB 113 (quoting *Pennco,* 684 F.2d at 343).

The *Curtin Matheson* court raised the question of whether the Board's position in *Station KKHI* establishes a "new" standard for characterizing strike replacements in withdrawal of recognition cases. The *Curtin Matheson* court rejected the Board's contention that *Station KKHI* established a new standard because

> [o]perationally the *Station KKHI* standard has the same effect as the presumption that striker replacements support the union in the same ratio as the employees they replace.... Under either standard, the Company is required to have objective evidence regarding the striker replacements' non-support in order to count them as employees whom the Company doubts support the Union.

*Id.* at 367.

It is true, as the *Curtin Matheson* court notes, that under both the Board's prior presumption of union support among replacement workers and its current neutral position under *Station KKHI,* an employer must come forward with some objective evidence regarding the replacement worker's failure to support the union. This does not mean, however, that the two standards are the same. The difference is the nature and amount of evidence required. Simply stated, the new Board position gives more flexibility to consider each situation on its own facts. *See Curtin Matheson,* 859 F.2d at 370 (Williams, J., dissenting).

The question is presented whether the Board's position established in *Station KKHI* can be reconciled with the decision of the former Fifth Circuit in *Randle–Eastern.* The holding of *Randle–Eastern* is that the presumption that new workers support the union in the same ratio as the employees they have replaced "does not apply where the 'turnover' results from the replacement of strikers." 584 F.2d at 728. While the court did approvingly cite to Professor Gorman's treatise, its decision to include permanent replacements as objective evidence of loss of union support was based on the fact that the Union was bargaining for the discharge of the striker replacements to make room for the strikers. The existence of picket line violence with respect to striker replacements was also a factor which strengthened the Company's doubt that those employees support the Union.

■ We decline to read *Randle–Eastern* so broadly as to establish an unqualified rule applicable in every strike situation where replacement workers are hired. The decision in *Randle–Eastern* should be limited to the specific facts of the case.[13] Read more narrowly, *Randle–Eastern* does not conflict with the Board's *Station KKHI* ad hoc approach since the evidence presented by the employer in *Randle–Eastern* is sufficient to satisfy the requirement of *Station KKHI* that the Company present "some further evidence of union non-support" in order to count replacements as employees whom the company

**13.** We decline to speculate as to what other factors, if any, may be sufficient to constitute "some further evidence of union nonsupport." *See Pennco,* 684 F.2d at 343. The *Randle–Eastern* decision is analogous in this respect to *Whisper–Soft Mills, Inc. v. NLRB,* 754 F.2d 1381 (9th Cir.1984). After expressly rejecting the presumption that striker replacements support the union in the same ratio as strikers, the court concluded that the ALJ was correct in determining that the replacement workers did not support the Union under the "unique circumstances" of the case: the Union was demanding discharge of a majority of the replacement workers. 754 F.2d at 1388. In *Whisper–Soft,* there was no violence, no rejection of union leadership, no resignation, and no union dormancy.

doubts support the Union. *See Pennco,* 684 F.2d at 343.

■ In this case, the Company expressly rejected proposals made by the mediator on behalf of the Union that Bickerstaff's strike replacements be discharged so that striking employees could return to work.[14] Moreover, as previously noted, the strike replacements had to cross a picket line, at least for a time, in an atmosphere of violence. Common sense dictates that it is highly unlikely that a replacement worker supports the union if the union is negotiating for his discharge and he crosses a union-sponsored picket line, violent or not, to report to work each day. Under the facts of this case, we conclude that the Company was justified in counting the striker replacements as employees whom the Company doubts supports the Union.

14. The Board submits that the mediator rather than the union in this case made the inquiries as to whether the Company could take back the striking employees in preference to the replacements. The Board argues that this inquiry "hardly matches the evidence in *Randle-Eastern*" of union demands. We note in *Randle-Eastern,* as in this case, the facts show active participation by the mediator on behalf of the Union for the preference of returning strikers over replacements. Moreover, the Board's characterization of union demands are overstated. The facts in *Randle-Eastern* show that the Union, after taking its initial position that returning strikers be given priority over the replacements, stated that it would be "flexible" on the replacement versus returning strikers issue. 584 F.2d at 724. In both cases, the Union was negotiating against the interests of the replacements.

15. SUMMARY OF THE BARGAINING UNIT ON WITHDRAWAL OF RECOGNITION

| | Randle-Eastern | Bickerstaff |
|---|---|---|
| 1. Number of employees in the bargaining unit on the date of strike | 177 | 304 |
| 2. Number of employees participating in the strike | 166(94%) | 195(64%) |
| 3. Number of strikers who had returned to work on the date of non-recognition | 46(26%) | 133(44%) |

■ A comparison between the bargaining unit in *Randle-Eastern* and the bargaining unit in this case is instructive for purposes of applying the *Randle-Eastern* criterion.[15] The comparison illustrates that the Bickerstaff percentages in all the relevant categories exceeded those found in *Randle-Eastern:* strike participation (Bickerstaff had a lower percentage of its employees to go out on strike than *Randle-Eastern*); returning strikers (Bickerstaff had a higher percentage of strikers to return to work than *Randle-Eastern*); resignations or check-off withdrawals (Bickerstaff had a higher percentage of employees who either resigned or withdrew from dues check-off authorizations than *Randle-Eastern*); and striker replacements (Bickerstaff had a higher percentage

| | Randle-Eastern | Bickerstaff |
|---|---|---|
| 4. Number of employees who resigned or withdrew from dues authorizations after the strike | 19(11%) | 38(13%) |
| 5. Number of permanent striker replacements working on date of non-recognition | 47(27%) | 93(31%) |

We note that since striking employees retain their employee status under section 2(3) of the Act, 29 U.S.C. Sec. 152(3), the bargaining unit for purposes of determining the union's majority status in a case where the employer has hired striker replacements consists of the total number of strikers *and* strike replacements at the time of withdrawal of recognition. *C.H. Guenther & Son, Inc. v. NLRB,* 427 F.2d 983, 986–87 (5th Cir.), *cert. denied,* 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970); *NLRB v. Windham Community Memorial Hospital,* 577 F.2d 805, 813 (2d Cir.1978). In the instant case, the Board submits that there were 50 employees still on strike at the time the company withdrew recognition which should be included in the bargaining unit of 304 employees, resulting in a total of 354 unit members. The Company contends that the record shows a number of strikers who should not be included in the total bargaining unit because they either obtained permanent employment elsewhere or did not want to return to work. According to the Union's position, the Company was required to have a good faith belief that at least 177 of the unit employees did not desire union representation.

of striker replacements than *Randle–Eastern* ).

The only other factor present in *Randle–Eastern* which is not present in this case was the union's statement that twenty percent of the strikers would not be returning to work.[16] 584 F.2d at 727. On the basis of these factors, the *Randle–Eastern* court recognized the existence of a good faith doubt of union support. In this case, there are a number of other factors in the record which support the Company's good faith doubt of majority status which were not present in *Randle–Eastern.* These factors include the breakdown in union leadership, union dormancy, and employee dissatisfaction and disillusionment with the Union.

The Board relies on *Pepsi Cola Bottling Co., etc. v. NLRB,* 659 F.2d 87 (8th Cir. 1981) for the proposition that an offer, once made, will remain on the table unless explicitly withdrawn by the offeror or unless circumstances arise which would lead the parties to reasonably believe that the offer had been withdrawn. *Id.* at 90. The Board concluded that the Company "did not withdraw its final offer before acceptance and the evidence reveals no 'circumstances … which would lead the parties to reasonably believe that the offer had been withdrawn.'" This conclusion, however, ignores the change in circumstances which had occurred by the time the Company withdrew recognition. After the meeting between the Union and the Company on January 13, 1986, Bickerstaff received no further communication from anyone on behalf of the Union with regard to contract negotiations, grievances, the strike or any other matter, until the Union's letter of April 8, 1986, by which it offered to enter into a collective-bargaining agreement. During this period of time, the Union was totally inactive. There was no documented participation by bargaining unit members in any union-sponsored activities after January of 1986. The only grievance filed against the Company during this time period was filed by an individual without union support or participation. The business agent had resigned nearly four months prior to withdrawal of recognition. No new business agent for the Local had been appointed and the Local's elected officials were removed from office. An unfair labor practice charge was filed against the Union by three of Bickerstaff's employees on March 6, 1986, alleging a failure by the Union to fairly represent its members as the bargaining representative. The Board's own investigation into this charge verified that some members of the Local were dissatisfied with the Union representation, which stemmed in part from the failure to pay strike benefits as promised by the Union. The evidence in the record shows that the Union had effectively abandoned its role as the representative of the unit employees by the time the Company withdrew recognition.

There is no authority cited by the Board, and none exists, for the proposition that withdrawal of a prior offer is a condition precedent to an employer's withdrawal of recognition based on a good faith doubt of the Union's majority status.[17] If the

---

**16.** The Company did rely on a statement of a union organizer, which was quoted in a local newspaper in January 1986, indicating that most of the strikers "would never go back to work" for Bickerstaff unless they received a favorable settlement of the strike. The Company contends that since the Union's demands were so unreasonable, this statement was tantamount to saying that those strikers had no intention of returning. We note that this "subjective evidence may be used to bolster the argument that such doubt existed." *See NLRB v. Windham Community Memorial Hospital,* 577 F.2d 805, 811 (2d Cir.1978).

**17.** The events leading to the withdrawal of recognition in this case are essentially identical to those found in *Curtin Matheson,* 859 F.2d at 364.

In *Curtin Matheson,* the Company made a final offer which was rejected twice by the Union. While the strike was in progress, the Company put into effect the wage schedule proposed in its final offer. Within a month, the Union ended the strike, offered unconditionally to have the striking employees return to work, and informed the Company that it was accepting its final offer. Thereafter, the Company notified the Union that the final offer was not available, and because it had doubts as to the Union's majority status, that the Company was withdrawing recognition and refusing to bargain further. In *Curtin Matheson,* as in this case, there was no formal withdrawal of the final offer before the withdrawal of recognition based on a good faith doubt of majority status.

circumstances changed such that the Company reasonably believed that the Union no longer represented a majority of its employees on April 8, 1986, Bickerstaff had no duty to withdraw its offer by notifying the Union.

 The Board has rejected a composite showing of objective evidence which is sufficient to establish, clearly and convincingly, that Bickerstaff had a reasonable basis to support a good faith doubt as to the representative status of the Union. Unlike many other cases in which the circuit courts have upheld the Board's determination that the employer did not have a reasonable basis for doubting the Union's majority status, we conclude that Bickerstaff's doubt

> was not based solely upon "speculative and subjective" evidence [citation omitted], dependent upon "isolated reports" from "vague and unidentified sources" [citation omitted], or predicated upon the President's "feeling" that the Union had lost majority support [citation omitted]. Rather, the Company made permissible inferences from solid evidence ... which in our view were sufficient to support a reasonable doubt of the Union's continued majority status.

*Randle–Eastern*, 584 F.2d at 729. Consequently, we are unable to conclude that substantial evidence on the record as a whole supports the Board's conclusion that the Company unlawfully withdrew recognition.

In determining whether an employer has sufficient objective evidence of loss of union support to justify withdrawal from bargaining, the cumulative effect of *all* of the evidence must be considered. *Thomas*, 687 F.2d at 868. Generally, several indicia of loss of majority support are required and no one factor is determinative, i.e., striker replacements or union dormancy. *Soule Glass*, 652 F.2d at 1110. We acknowledge that the above factors do not translate readily into a "precise numerical estimate" of the Union's strength, but this is not fatal to the Company's case. *Randle–Eastern*, 584 F.2d at 729. We emphasize that the Company need not have conclusive proof that the majority of employees do not

support the Union, only sufficient "objective evidence to support a good faith doubt of majority status." *Id.* In our view, the Board has erroneously looked at each piece of evidence in isolation, instead of looking at the totality of factors presented by the Company. The Ninth Circuit, in reversing a Board order finding insufficient evidence in a good faith doubt case, had this criticism of the Board which is applicable to this case:

> The Board concluded that each fact considered separately did not give [the Company] reasonable grounds to doubt the union's majority status and that the evidence as a whole was no greater than the sum of its separate parts.... The courts require an assessment of the cumulative force of the combination of factors [citations omitted]. Even when each factor considered alone is insufficient for a good faith doubt of majority status, the combination may be adequate.

*Golden State Rehabilitation Convalescent Center v. National Labor Relations Board*, 566 F.2d 77, 79–80 (9th Cir.1977).

 We therefore reverse the Board's finding that the Company violated Sections 8(a)(1) and (5) by withdrawing recognition of the Union. The court also reverses the Board's findings that the Company violated these sections by refusing and failing to furnish the Union with certain information requested, and refusing to execute a collective-bargaining agreement the Board found was reached on April 8, 1986. Since an employer is only obligated to provide its employees' bargaining representative with information necessary and relevant to fulfill its statutory collective-bargaining function, the Company did not commit an unfair labor practice by refusing to provide the information requested. *See Curtin Matheson*, 859 F.2d at 367. By the same logic, no violation of Sections 8(a)(1) and (5) occurred when the Company refused to execute a contract when the Union attempted to accept the Company's November 6, 1985 offer.

ENFORCEMENT DENIED.